*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0423P (6th Cir.)
File Name: 01a0423p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

    *v.*

RANDY GRAHAM,
       *Defendant-Appellant.*

No. 99-1719

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 98-00054—Richard A. Enslen, District Judge.

Argued: January 24, 2001

Decided and Filed: December 17, 2001

Before: BOGGS and MOORE, Circuit Judges; COHN,
Senior District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Jeffrey J. O'Hara, Grand Rapids, Michigan, for
Appellant. Joan E. Meyer, ASSISTANT UNITED STATES
ATTORNEY, Grand Rapids, Michigan, for Appellee.

———————————

[*]The Honorable Avern Cohn, Senior United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

**ON BRIEF:** Jeffrey J. O'Hara, Grand Rapids, Michigan, for Appellant.  Joan E. Meyer, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which BOGGS, J., joined.  COHN, D. J. (pp. 51-87), delivered a separate dissenting opinion.

————————

## OPINION

————————

KAREN NELSON MOORE, Circuit Judge.  This case involves Defendant-Appellant Randy Graham's direct appeal from his criminal conviction for conspiracy to commit offenses against the United States and several weapons possession and drug-related counts by a jury in the Western District of Michigan.  Graham was a member of a local militia organization which was planning to attack government targets on an unspecified future date.  Graham also grew and sold marijuana, part of the proceeds of which he used to help pay for weapons acquisitions related to his militia activity.  Graham was sentenced by the district court to 660 months or 55 years in prison.  He challenges on appeal his conviction and his sentence.  For the following reasons, we **AFFIRM** the district court's denial of Graham's two motions to suppress evidence; the district court's denial of his motion to sever counts; the district court's application of § 3A1.4 of the United States Sentencing Guidelines Manual ("U.S.S.G.") in determining Graham's sentence; and the district court's consecutive sentencing on two convictions under 18 U.S.C. § 924(c)(1); and we **VACATE** the district court's application of the statutory sentencing range for a quantity of marijuana not found by a jury beyond a reasonable doubt, and **REMAND** for resentencing.

## APPENDIX A

| Count | Statutory Maximum | Guideline Score Exclusive Of Adjustment For Terrorism | Guideline Sentence | Guideline Score Including Adjustment For Terrorism | Guideline Sentence | Sentence |
|---|---|---|---|---|---|---|
| 1-Conspiracy To Commit An Offense Against the United States | 5 years | OL 29 CH I | 87-108 months | 41 (29+12) CH VI | 360 months to life | 60 months concurrent with 9, 10, 11 |
| 9-Unlawful User of Marihuana In Possession Of Firearms | 10 years | OL 20 CH I | 33-41 months | 34 (20+14) CH VI | 262-327 months | 120 months concurrent with 1, 10, 11 |
| 10- Unlawful Attempt To Manufacture Marihuana | 5-40 years (100 plants) | OL 20 CH I | 33-41 months | 34 (20+14) CH VI | 262-327 months | 360 months concurrent with 1, 9, 11 |
| 11-Conspiracy To Manufacture Marihuana | 5-40 years (100 plants) | OL 20 CH I | 33-41 months | 34 (20+14) CH VI | 262-327 months | 360 months concurrent with 1, 9, 10 |
| 13-Carrying A Semi-Automatic Weapon in Relationship To A Crime Of Violence | 20 years consecutive | Same | Same | Same | Same | 240 months consecutive |
| 14-Carrying A Firearm in Relationship To A Drug Crime | 5 years consecutive | Same | Same | Same | Same | 60 months consecutive |

We know there is no federal common law crime. *United States v. Hudson and Goodman*, 11 U.S. 32 (1812). Congress in its mandate to the Sentencing Commission in 1994 and again in 1996 came close to establishing punishment for a common law crime – terrorism. The motives for the action by the Congress are not disclosed in the legislative history of either the 1994 or 1996 acts. The Sentencing Commission promulgated § 3A1.4 initially to cover "international terrorism;" Congress added domestic terrorism with no elaboration. Moreover, there is nothing in either the statute or the guideline to prohibit a district court once it enhances the offense level to not less than 32 and the criminal history to VI (effectively a minimum sentence of 210 months from departing downward for any of the reasons allowed in Chapter IV of the guidelines.

This dissent was substantially completed before the terrorist acts on the World Trade Center, the Pentagon, and in Pennsylvania on September 11, 2001. These horrific events, like the bombings of the U.S. Embassies in Tanzania and Kenya, and the U.S.S. Cole, involve weapons of mass-destruction as instruments of terrorism and are very far outside the conspiratorial conduct of Graham as reflected in the record of this case.

For all of the reasons stated above, I disagree with the majority opinion's approval of the actions of the district court in increasing Graham's sentence by over 250 months by application of the § 3A1.4 enhancement. This is why I dissent.

# I. BACKGROUND

## A. Graham's Drug Activity

Randy Graham, who is now 45 years old, lived in Battle Creek, Michigan, where he completed high school and thereafter had intermittent employment. In 1977, he joined the United States Army. He was discharged from the Army in 1978 and returned to Michigan where he held various jobs.[1] At trial, William Huggett, a close friend of Graham's, testified that Graham was a regular user of marijuana. According to Huggett, he and Graham began to sell marijuana in 1988. At that time, Graham and Huggett would also raid other people's marijuana patches. In 1989, Huggett testified that they began to grow their own marijuana. Working with Huggett, Graham planted marijuana plants indoors in Huggett's home; later, they moved their operation outdoors to nearby swamps. In 1994, their best year, they harvested forty pounds of marijuana, although Huggett stated that many years they harvested much less.

Local police seized Huggett's and Graham's marijuana plants and various weapons, which were stored on Huggett's uncle's property, in February 1995. In early 1996, Huggett and Graham purchased a trailer in which to grow marijuana; it was set up next to the trailer in which Graham lived. Huggett testified that they harvested 23 or 24 pounds of marijuana in 1996. In 1997, Huggett and Graham planted seven plots of marijuana plants in nearby swamps. In the summer or fall of 1997, the Southwest Drug Enforcement Team, a drug interdiction group, seized six of the seven patches of marijuana plants. Huggett testified that, in 1996

---

[1] Graham received an honorable discharge after his commanding officer initiated action to discharge him under the Army's now-discontinued Expeditious Discharge Program. Graham's commanding officer reported that Graham was unable "to comply with the basic requirements of military life and instructions." Graham performed "unsatisfactory" work, had a "surly," disrespectful attitude toward "anyone in authority," and was essentially "untrainable." Joint Appendix ("J.A.") at 1448.

and 1997, Graham would sometimes carry with him a firearm while they were tending their marijuana patches. Huggett also testified that Graham used the money from his drug activities to purchase weapons and for living expenses.

## B. Graham's Militia Activity

Graham and Huggett were members of a militia group called the Michigan Militia Wolverines in the early years of their marijuana cultivation business. Huggett testified that, at some point after 1995, Graham and others were expelled from the Wolverines because they were advocating violence against the government. In the summer of 1996, those individuals who had left the Wolverines formed a new militia group called the "North American Militia" ("NAM"). The purpose of the militia group was to prepare for a "war" with the government and ultimately to overthrow the government. NAM members advocated an offensive "first strike" against the government, out of fear that the government was planning an attack against them. The war was sometimes referred to as an "Armageddon." J.A. at 1135. The commanding officer of the militia was "Colonel" Ken Carter, who had organized the group. J.A. at 1133. Bradford Metcalf was Carter's second-in-command. Graham was not considered a leader, but was an active member of NAM. From the summer of 1996 through March 1998, NAM members met at least twice a month at Speed's Koffee Shop in Urbandale, Michigan or at a mall in Kalamazoo. There, members would discuss coordination with other militia groups and political events as well as coordinate training exercises and plan their attacks. Various dates for attack were selected, beginning with June 7, 1997, although each date was subsequently postponed by Carter.

Undercover Bureau of Alcohol, Tobacco, and Firearms ("ATF") Agent Robert Stumpenhaus infiltrated NAM sometime in April 1997. Agent Stumpenhaus testified at trial that he participated in over ten meetings at Speed's and at the

http://www.usdoj.gov. Review of the last four reports on Terrorism in the United States, dated 1996, 1997, 1998, and 1999, contains no reference to the group of which Graham was a part and only a brief reference to militia groups in general as terrorist organizations. Likewise, review of the several articles on terrorism in the FBI's Law Enforcement Bulletin, a monthly publication, contains no articles on militia groups as terrorist organizations. This review of FBI published materials calls into question even more than the eleventh hour assertion by the government that the § 3A1.4 enhancement should apply in sentencing Graham and its willingness to agree with Carter to a 60 month maximum sentence the credibility of the government's position here.

Others have noted the difficulties associated with defining terrorism. *See* PHILIP B. HEYMANN, TERRORISM AND AMERICA: A COMMONSENSE STRATEGY FOR A DEMOCRATIC SOCIETY, 3-7 (paperback ed. 2000) (discussing the global efforts to define terrorism); *see also* The Terrorism Research Center - Next Generation of Terrorism Analysis, at http://www.terrorism.com/terrorism/def.shtml (stating "Terrorism by nature is difficult to define" and "even the government cannot agree on one single definition" and listing several definitions of terrorism).[8]

Perhaps a law review writer back in 1987 stated it best when in discussing the definition of terrorism observed: "Finding a suitable definition for terrorism . . . is a quagmire." Patrick L. Donnelly, *Extraterritorial Jurisdiction Over Acts of Terrorism Committed Abroad: Omnibus Diplomatic Security And Antiterrorism Act of 1986*, 72 CORNELL L. REV. 599, 607, n.56 (1987). This observation hold true today.

---

[8] Indeed, in the wake of a heightened awareness of terrorism following September 11, 2001 there has been commentary on the difficulty in defining the term "terrorism." See Michael Kinsely, *Defining Terrorism*, THE WASHINGTON POST (Oct. 5, 2001), at A37 and Oliver Libaw, *How Do You Define Terrorism?* ABCNEWS.com (Oct. 16, 2001).

approves of is a breadth of discretion in the district court inappropriate to the dictates of 18 U.S.C. § 2332b(g)(5) and of § 3A1.4 based on conclusionary findings of fact more likely than not. This simply allows for a soft definition of terrorism. As seen from the legislative history, "terrorism" involves discrete acts - as defined under § 2332b(g)(5).

Beyond the definition of a "Federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5) and the other definition considered by the Congress including the definition in Section 212(a)(3)(B)(ii) of the Immigration and Naturalization Act, 8 U.S.C. § 1182, there are at least two additional definitions found in federal law.[7]   22 U.S.C. § 2656f, which is part of Chapter 38 of Title 22 of the United States Code governing the Department of State, defines "terrorism" as follows:

> (2) the term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents; . . .

The Federal Bureau of Investigation, which has as part of its responsibilities, the responsibility for crimes which involve terrorist activities, has a particular definition of terrorism. 28 C.F.R. 0.85(l). The definition reads:

> Terrorism includes the unlawful use of force and violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political or social objectives.

The FBI, through the Counterterrorism Threat Assessment and Warning Unit of its National Security Division issues annually a report of terrorism in the United States available at

---

[7] Section 802 of USA PATRIOT Act of 2001 added a new definition of "domestic terrorism" under 18 U.S.C. § 2331. Section 411 amended 8 U.S.C. § 1182(a)(3) of the Immigration and Nationality Act to include other definitions relating to terrorism, including a definition of "engage in terrorist activity and "terrorist organization."

mall with various members of NAM.[2]   Stumpenhaus and other witnesses who testified at trial reported that among their activities, NAM collected and stockpiled weapons; held target practice and conducted paramilitary training; selected various federal and state "hard" and "soft" targets; and plotted strategy for their war. Stumpenhaus reported that Carter's strategy was to attack certain targets in Calhoun County, Michigan, and the surrounding area, create chaos, and then attempt to "hold on" for three to five days while militias in other parts of the country would rise up against the government. J.A. at 1063-64. In preparation for their war, NAM members participated in training activities, such as going on "bivouacs;" learning "close quarters battle;" and securing a building with weapons and emptying the building of people and weapons. J.A. at 1166.

Under Carter's direction, each member of the militia was assigned to a three-person "cell" which was responsible for "taking out" various "hard" and "soft" targets in a certain geographical region. Among the "hard" targets selected for attack were: (1) the intersection of Interstate 94 and U.S. Route 131 near Kalamazoo, Michigan; (2) power facilities; (3) fuel depots and gas stations; and (4) communication facilities such as a TV station in Kalamazoo, Michigan. Also mentioned as a site for attack was the nearby Fort Custer Army National Guard Post. NAM's goal was to cut off transportation, electricity, gas, and communication to the area. Among the "soft" targets identified were federal prosecutors, judges, and other federal officials as well as Senator Carl Levin of Michigan and other members of Congress. Carter also established a method of communication among NAM members that involved beeper messages and a telephone tree; certain beeper codes were to alert members to be ready to start battle.

---

[2] Stumpenhaus did not meet Graham until his sixth meeting with the group on June 10, 1997.

According to one witness, NAM members' preferred weapon was a semi-automatic rifle, but members also discussed their possession of machineguns and homemade bombs. Testimony also established that NAM members discussed using a variety of attack methods and devices, including chemical warfare, bombs, grenades, and land mines.

Graham's involvement in these activities included attending meetings, participating in training exercises, recruiting members, and purchasing weapons with money derived from his marijuana sales. Notably, Graham was the leader of one of the three-person cells and he "reconned" his assigned region, meaning he visited his assigned attack area and surveyed his targets. J.A. at 1082. At one meeting, on June 17, 1997, he drew a map of Stumpenhaus's assigned region, marked targets for him to attack including four electrical targets, a V.A. hospital, a gas station, Fort Custer, and a television station, and told him he would help him to "reconn" the area. J.A. at 1086. He also made numerous statements indicating that he was ready to attack his assigned targets; that he possessed a wide variety of weaponry; and that he was prepared to kill federal agents and police officers.

## C. Government Investigation

From July 3, 1997 to August 30, 1997, government agents conducted a wiretap on Carter's telephone. The government recorded numerous statements by Graham which indicated his possession of significant weaponry and firepower and his willingness to use it on federal agents and police officers. On August 13, 1997, federal agents executed a search warrant at Metcalf's property, which was NAM's training site. One witness described Metcalf's home as "a miniature military compound." J.A. at 1150. There, agents discovered that Metcalf's property, approximately 40 acres, had been fortified with bunkers and foxholes and that he had set up a firing range. From his home they seized machineguns; loaded semi-automatic assault rifles and thousands of rounds of ammunition; assault rifles; thirty pounds of smokeless gun powder; silencers; several feet of time fuse; four grenade hulls

### 2.

Here, even if I am wrong on my view that the § 3A.1.4 enhancement does not apply, the sentence should be vacated and the case remanded resentencing for the reason that the district court failed to articulate the evidentiary standard on which the finding the § 3A1.4 enhancement applied and also failed to articulate the specific facts on which it found that the enhancement applied. On remand, the district court should at least be required to do is to make findings based on a detailed articulation of facts found beyond a reasonable doubt in justification of any enhancement. Indeed, the majority notes that because the jury returned a general verdict on the § 371 charge, there is no way of knowing of what substantive crimes the jury found Graham guilty of conspiring.

### IV. Conclusion

My disagreement with the majority opinion's approval of the district court's enhancement of Graham's sentence should not be considered in any way a denigration of Graham's crimes or in any way an attempt to simply ameliorate the severity of his sentence of 660 months. Graham was foolish in light of the trial record for rejecting the government's willingness to limit his sentence to 60 months if he pleaded guilty. However, there is no suggestion on the record that on the day Graham changed his mind and opted for trial there was any reason for him to think that the government would go back to the grand jury and obtain a superceding indictment which included charges which had the potential of adding 25 years to whatever sentence he might receive if found guilty of the charges contained in the original indictment. There was certainly no reason for him to believe the district court would find that the § 3A1.4 enhancement was appropriate to his offenses of conviction.

What is significant in the majority's approval of the § 3A1.4 enhancement to Graham's offense level and criminal history is its condoning a definition of a "Federal crime of terrorism" broader than that contemplated by the Congress in its enactment of 18 U.S.C. § 2332b(g)(5). What the majority

*United States v. Farese*, 248 F.3d 1056 (11th Cir. 2001), involved a prosecution for conspiracy to participate in the affairs of an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962. The Court of Appeals for the Eleventh Circuit required the district court to find beyond a reasonable doubt that defendants conspired to commit a particular object of the offense. In *United States v. Ross*, 131 F.3d 970 (11th Cir. 1997), because the verdict did not establish which offense was the object of the charged conspiracy, the Court of Appeals held that the district court was required to make a determination as to which offense as if it was sitting as a trier of fact. Lastly, in *United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001), the Court of Appeals for the Ninth Circuit held that a sentencing enhancement which yielded prolonged imprisonment required proof by clear and convincing evidence.

The majority, however, rejects *Kikumura* to the extent that it holds that a higher standard of proof is not required for sentencing factors that do not increase the maximum sentence faced by the defendant, finding that interpretation inconsistent with the Supreme Court holdings in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Even if I agree with the majority's interpretation, I still find error in application of the preponderance standard in applying § 3A1.4 to Graham because the statutory maximum for violating § 371 is five years. Applying the terrorism enhancement, Graham's sentencing range was increased to 360 months to life. Because the majority finds that application of § 3A1.4 to Graham's conviction under § 371 was proper because it pertained to a conspiracy that "involved" or "intended to promote" a "federal crime of terrorism," and because application of § 3A.1.4 increased Graham's sentencing range beyond the statutory maximum, I believe that even under the majority's approach, a higher standard of proof is required.

and a live grenade fuse; flare and tear gas launchers; and military combat equipment including flak vests, helmets, and gas masks. They also seized books and manuals on how to make automatic weapons, construct bombs, and make silencers. Subsequent to this seizure, members of NAM continued to meet regularly at Speed's and at the mall through March 1998.

Pursuant to a forty-page affidavit sworn to by an ATF agent, a magistrate judge authorized an arrest warrant for Graham and a search warrant of Graham's trailer home on March 17, 1998. On March 18, 1998, federal agents from the FBI and ATF conducted a search of Graham's trailer home.[3] The agents seized the following from his home: tins containing marijuana seeds and marijuana paraphernalia; plastic containers of marijuana; 32 marijuana seedling plants; a pistol; a Ruger .22-caliber rifle; a semiautomatic assault rifle; a sniper rifle; an ammunition carrier; a magazine and clips; and several videotapes, books, and articles relating to ammunition, combat, and survival. While this search was occurring, agents performed a warrantless search of Graham's pickup truck from which they seized the following: a semiautomatic rifle, a Beretta pistol, a bag of marijuana, and several cans of ammunition.[4] Graham was arrested during the search and taken into custody by the agents.

**D. Criminal Proceedings**

On March 20, 1998, Graham was named in a criminal complaint alleging that he had conspired to manufacture marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Graham and two co-conspirators, Carter and Metcalf, were

---

[3] Carter's home was searched the same day, and he was also arrested.

[4] Defense counsel established at trial that it was not illegal for Graham to possess any of the weapons seized on his property.

then named in a twelve-count indictment on April 9, 1998.[5] A grand jury returned a fourteen-count superseding indictment against Graham and Metcalf on July 9, 1998. The superseding indictment alleged that Graham was a member of the North American Militia group and that he conspired from the summer of 1996 through March 1998 with Carter and Metcalf[6] to "possess machineguns, to plan and discuss attacks upon various federal facilities and instrumentalities of interstate commerce and to threaten to assault and murder federal officers and employees." J.A. at 76.

In Count 1, Graham was charged with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371. The indictment alleged that Graham willfully and knowingly conspired to: possess machineguns, in violation of 18 U.S.C. § 922(o)(1); threaten to assault and murder federal officers, as designated in 18 U.S.C. § 1114, with the intent to impede, intimidate, and interfere with these officers while engaged in the performance of official duties, in violation of 18 U.S.C. § 115(a)(1)(B); forcibly assault, resist, oppose, impede, intimidate, and interfere with federal officers when they were engaged in the performance of their official duties, in violation of 18 U.S.C. § 111; and maliciously damage and destroy and attempt to damage and destroy by means of an explosive any building, vehicle, or other real or personal property used in interstate commerce, in violation of 18 U.S.C. § 844(i).

Other counts alleged that Graham: knowingly possessed a Browning-type .30-caliber machinegun in violation of 18 U.S.C. § 922(o)(1) (Counts 3 and 4); knowingly possessed a Browning-type .50-caliber machinegun (Count 5); knowingly

---

[5]Carter pleaded guilty to Count 1 of the Indictment on June 1, 1998, and he was sentenced to five years in custody.

[6]Metcalf was found guilty by a jury as to Counts 1, 3-8, and 12 on November 18, 1998 and was sentenced to forty years in custody. We upheld his conviction and sentence, *see United States v. Metcalf*, No. 99-1667, 2000 WL 924171 (6th Cir. June 28, 2000).

cases in which it was applied, the offense of conviction was enumerated in 18 U.S.C. § 2332b(g)(5)(B).[6]

### C. The Standard of Proof

#### 1.

The majority opinion's position that the district court need only find the conduct which supports § 3A1.4 enhancement by a preponderance of the evidence is also wrong. The standard appears to find support in the Commentary to U.S.S.G. § 6A1.3, Resolution of Disputed Factors (Policy Statement) which states:

> The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of the case.

This statement should, however, be considered in conjunction with what the Sentencing Commission says in § 1B1.2, Application Note 4, discussed *supra*. When the district court increases a sentence by 250 months more than what the offense level and criminal history associated with the crime of conviction call for, the facts in support of the enhancement should surely be established beyond a reasonable doubt or at least by clear and convincing evidence. The Third Circuit in *Kikumura*, *supra* said that

> a sentencing hearing that functions as "a tail which wags the dog of the substantive offense" [citations omitted] ... a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations."

918 F.2d at 1100-01.

---

[6]This information comes from the files of the United States Sentencing Commission.

meaning of the term is "the systematic use of terror as a means of coercion." Webster's *Third New International Dictionary* 2361 (1986). The United States Code defines "terrorism" in context completely different than sentencing – that of State Department reporting requirements – as "premeditated, politically motivated violence perpetrated against noncombatant targets by substantial groups or clandestine agents." 22 U.S.C. § 2656f(d)(2).

997 F.2d at 598.

Second, in *United States v. Barr*, 963 F.2d 641 (3d Cir. 1992), the Court of Appeals for the Third Circuit noted that "grounds for departure listed in § 5K2.1 through § 5K2.15 generally involved actual conduct or tangible consequences as justification for an upward departure." 963 F.2d 653-654.

### 2.

The precedential history also supports my view that for the § 3K1.4 enhancement to apply, there must be a conviction of one of the enumerated offenses in 18 U.S.C. § 2332b(g)(5)(B) and that there must be actual conduct or attempted conduct calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct.

### 3.

The circumstances of the application of § 3A1.4 to other sentences further supports my view that there was an aberrational application of the enhancement to Graham. Sentencing Commission statistical reports state its application six times in 1999 and 2000 exclusive of the application to Carter, Metcalf and Graham. *See* 1999 and 2000 Sourcebook of Federal Sentencing Statistics, Table 18. In five of the six

possessed firearms as an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3) (Count 9); knowingly, willfully, and unlawfully attempted to manufacture marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 10); knowingly, willfully, and unlawfully conspired to manufacture marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 11); knowingly used and carried a semiautomatic assault weapon during and in relation to a crime of violence as charged in Count 1, in violation of 18 U.S.C. § 924(c)(1) (Count 13); and knowingly used and carried a firearm during and in relation to a drug trafficking crime as charged in Counts 10 and 11, in violation of 18 U.S.C. § 924(c)(1) (Count 14).

Prior to trial, Graham filed several motions in the district court. First, he sought to suppress the evidence taken from his trailer home. He asserted that the affidavit on which the magistrate judge relied when issuing the search warrant did not establish probable cause to believe that criminal activity was occurring in Graham's trailer home. Graham also moved to suppress the evidence seized from his truck during the warrantless search. The district court denied both motions.[7] The district court did, however, grant Graham's motion to sever defendants, although it denied his motion to sever the drug-related counts, Counts 10, 11, and 14, from the firearm counts. Thus, Graham proceeded to trial alone, but on all counts against him.

Following a jury trial, Graham was found guilty of Counts 1, 9, 10, 11, 13 and 14. He was acquitted of Counts 3, 4, and 5. A Presentence Report was then prepared by the probation office. Graham made several objections to the Presentence Report. At the sentencing hearing, held on January 13, 1999, the district court rejected all of Graham's objections and adopted the factual findings and Sentencing Guidelines application in the report. As recommended in the Presentence

---

[7] Graham also made a motion to suppress statements made to law enforcement officers after he was taken into custody. This motion was granted and is not before this court.

Report, the district court applied U.S.S.G. § 3A1.4 to Graham's sentence for promoting terrorism. The application of this provision increased Graham's criminal history category from level I to level VI. His total offense level was calculated to be 41. Because the district court imposed consecutive sentences for the firearms convictions under 18 U.S.C. § 924(c)(1), Graham was sentenced to 660 months or 55 years in prison. He timely appeals from his conviction and sentence.

## II.  ANALYSIS

### A.  Motion to Suppress Evidence from Trailer Home

#### 1.  Lack of Probable Cause

In his first assignment of error, Graham challenges the district court's denial of his motion to suppress evidence seized from his trailer home. That evidence included various firearms, ammunition, firearms parts, marijuana plants, and marijuana seeds. Graham asserts that the affidavit on which the magistrate relied to issue the search warrant was insufficient to establish probable cause that instrumentalities or evidence of a crime would be found in Graham's trailer home. First, Graham asserts that "words alone do no[t] constitute a crime." Appellant's Br. at 24. Second, he argues that the affidavit does not point to any criminal activity associated with the trailer home. Third, he argues that nothing in the affidavit supported the conclusion that illegal weapons or other evidence of a crime could be found in the trailer. *Id.* According to Graham, because the affidavit was insufficient, all fruits of the search of the trailer home should have been suppressed.

The government counters that the district court properly denied Graham's motion to suppress because the affidavit elaborated upon the criminal activity which was associated with Graham's trailer and thereby established probable cause for the search. The government asserts that the affidavit described Graham's criminal activity in detail — including his participation in meetings at which targets for attack were

that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of, among other provisions, 18 U.S.C. § 175 (relating to biological weapons). *See* 28 U.S.C. § 2332b(g)(5). While Leahy did violate 18 US.C. § 175(a), there is absolutely no evidence in the record that Leahy sought to influence or affect the conduct of the government. In fact, the district court itself readily concluded that Leahy did not engage or attempt to engage in any act of terrorism, the court elects to depart upward only ten levels ... [and] [f]or the same reason, the Court does not increase the Criminal History Computation." Thus, we must conclude here, as we did in *Horton*, that the district court, in selecting U.S.S.G. § 3A1.4, chose an inappropriate analogy for determining the extent of the upward departure in this case.

169 F.3d at 446. The Court of Appeals concluded by stating:

Because there was no evidence showing that Leahy engaged in *an actual act or attempted act of terrorism*, we conclude that the district court, in selecting U.S.S.G. § 3A1.4, chose an inappropriate analogy for determining the extent of the upward departure in this case.

169 F.3d at 447 (emphasis added).

Two additional cases also call for comment. First, *United States v. Hicks*, 997 F.2d 594 (9th Cir. 1993), involved an upward departure to 10 years under § 5K2.15 in the sentencing of an offender who was responsible for launching mortar attacks and placing car bombs designed to damage government buildings in an effort to disrupt the functions of the Internal Revenue Service. The Court of Appeals vacated the sentence and remanded for resentencing because of the district court's failure to explain the extent of the departure. The Court of Appeals noted:

The term "terrorism" does not seem to have a precise definition in the context of the Guidelines. The plain

which everyone knew, it is unlikely that Wells neither knew nor had reason to know of the Freemen's activities. Since, as Wells points out, the Guidelines permit a defendant to be held responsible for the conduct of associates if that conduct was reasonably foreseeable, see U.S. SENTENCING GUIDELINES MANUAL § 2B1.3(b), his participation in the planning of violence may properly give rise to liability. Hence, the district court did not abuse its discretion by departing from the guidelines.

163 F.3d at 899.

*United States v. Leahy*, 169 F.3d 433 (7th Cir. 1999), is even more instructive. In *Leahy*, the defendant pled guilty to possession of a deadly toxin for use as a weapon in violation of 18 U.S.C. § 175(A). The toxin was highly lethal and defendant had threatened to use it. The district court, because no guideline had been promulgated by the Sentencing Commission for a violation of § 175(a), looked to an analogous guideline, which in its view was § 3A1.4. In so doing the district court rejected the government's recommendation that it looked to § 2K2.1 which covers "unlawful receipt, possession, or transportation of firearm of ammunition." This guideline calls for a sentencing range of 42 to 51 months. The district court departed 10 levels upward because in its view § 2K2.1 did not adequately capture the seriousness of defendant's offense conduct. While it looked to § 3A1.4, the district court did not depart upward the 12 levels called for because it recognized defendant did not engage in "*an actual act or attempted act of terrorism*," 169 F.3d at 438 (emphasis added). The Court of Appeals vacated the sentence finding that the district court erred in looking to § 3A1.4 to determine the proper extent of departure. The Court of Appeals said:

> In order for the district court's analogy to the Terrorism guideline to be appropriate, Leahy must have committed an offense "that involved, or was intended to promote, a federal crime of terrorism." *See* U.S.S.G. § 3A1.4. The term "federal crime of terrorism" is defined as an offense

selected, his surveillance of targets, and his threats to take action, as well as his plans to carry out those threats — and that this information, coupled with the fact that firearms are durable and were likely stored at Graham's home given the continuing nature of the conspiracy, established probable cause to search Graham's home for weapons.

The district court, in denying Graham's motion, reviewed the relevant case law and then explained that the fruits of the search would be suppressed only if there was not a fair probability that evidence of a crime would be found at the place to be searched and that the officers acted unreasonably in relying on the affidavit. Citing numerous particular assertions in the affidavit, the district court concluded that the detailed evidence was sufficient to establish probable cause to search for weapons. According to the district court, "[a]lthough the information was somewhat dated by March of 1998, given that firearms and ammunition are durable and useful items, that the crime was a long-term conspiracy and that Graham was likely to have kept firearms, given his paranoia toward the government and his other statements, there was still a fair probability as of March 17, 1998," that federal agents would find firearms and ammunition at Graham's home, which were evidence of Graham's participation in the illegal conspiracy. J.A. at 731.

When reviewing a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Brown*, 147 F.3d 477, 484 (6th Cir. 1998). We consider the evidence that the issuing magistrate had before him only to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *See United States v. Jones*, 159 F.3d 969, 973 (6th Cir. 1998) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). We defer to findings of probable cause made by a magistrate, and we will not set aside such a finding unless it was arbitrarily made. *Brown*, 147 F.3d at 484.

In *Illinois v. Gates*, the Supreme Court established the "totality of the circumstances" test for evaluating whether a magistrate properly determined there was probable cause when issuing a search warrant. *Gates*, 462 U.S. at 230. Under this test, probable cause is to be given a "practical, nontechnical conception." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. The issuing magistrate need only have had a substantial basis for concluding that probable cause existed. *Id.* at 238-39. Moreover, a finding of "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243-44 n.13.

In this case, ATF Special Agent Mark Semear authored a forty-page affidavit detailing the activities of militia members and explaining why there was probable cause to believe that objects named in the affidavit could be found at Graham's residence. The affidavit named as items to be seized: (1) firearms, ammunition, and any explosive materials or destructive devices; (2) evidence of ownership of these weapons; (3) computer hardware or software that may be instrumentalities or evidence of crime; and (4) videotapes, books, magazines, articles, and other material that relate to the making and use of firearms, explosives, paramilitary tactics and training, or the associations among NAM members. According to the affidavit, evidence seized would demonstrate that Graham was a part of one or more conspiracies to construct and use explosive devices to destroy interstate highways and various federal buildings; and to kill federal agents, police officers, federal judges, federal informants, and their family members. J.A. at 142-43 (Affidavit ¶ 9). The affidavit also alleged that evidence seized would prove that Graham possessed illegal firearms while being an unlawful user of controlled substances. *Id.*

defendant's offense conduct 15 levels. At the time of defendant's crimes, § 3A1.4 applied only to international terrorism. As noted above, the 1996 amendment to the Sentencing Guidelines as mandated by Section 730 of the AEDPA, included domestic terrorism. While rejecting application of § 3A1.4 because it could not be given retroactive effect, the Court of Appeals for the Fourth Circuit approved the upward departure under 18 U.S.C. § 3553(b) (sentencing court can deviate to take into account aggravating circumstances the guidelines did not adequately consider). In upholding a finding by the district court that the defendant involved himself in domestic terrorist activities, the Fourth Circuit rejected defendant's argument that he did not commit any violent acts and hence could not be considered a terrorist. The Court of Appeals said:

> However, there is ample evidence that shows that Wells' plans and activities support the upward departure. First, he agreed to participate in the grand jury of "our one Supreme Court," the "court" that the Freemen established to try officials. That court was also the forum of Wells' "trial" of IRS agents Smith and Vernell. Second, Wells bought a Chevrolet Suburban that he brought to Montana. The plan, as articulated by Schweitzer to the seminar attendees, was to use the Suburbans to abduct government officials, who would later be hanged. He intended to "bring a lot more of 'em out here." Third, Wells otherwise actively participated in the group, despite knowing its violent goals, and even helped the group prepare. Finally, he has not challenged the district court's finding that the group engages in terrorist activities.
>
> These facts counter balance Wells' contention that he neither knew of the Freemen's plans nor was involved in them. His use of the "court" for his own dispute with IRS officials, given the intention of the Freeman *900 to injury or kill government officials, can be considered a "terrorist" act. In addition, as the only supplier of the vehicles that were to be used in a violent plan about

conspiracy under § 371 is a "Federal crime of terrorism " is problematic. As seen from the Conference Report on Senate Bill 735, Congress intended that the enhancement apply *only* those crimes set forth under § 2332b(g)(5)(B), which does not include § 371. Indeed, the plain language of Section 730 shows Congress intended that the sentencing enhancement under § 3A1.4 apply only to the "Federal crimes of terrorism" as defined under § 2332b(g)(5). To hold that a conviction under § 371 is also a "Federal crime of terrorism" as that term has been carefully defined, goes against Congressional intent.

### B. The Precedents

### 1.

Contrary to the majority opinion's view there is case precedent in dealing with § 3A1.4. At least four court of appeals cases deal with the application of § 3A1.4. Two of the cases, *United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999) and *United States v. Fortier*, 242 F.3d 1224 (10th Cir. 2001), involve colleagues of Timothy McVeigh in the bombing of the Murrah Federal Building in Oklahoma City in 1995 and should be read as *sui generis* because of the enormity of his crime. McVeigh's crime did lead, however to the enactment of the AEDPA. See 32 Compilation of Presidential Documents 717-721, April 21, 1996 (Remarks and Statement of President Bill Clinton on signing the act)).

In *United States v. Wells*, 163 F.3d 889 (4th Cir. 1998), the defendant was convicted of a variety of offenses including mail fraud, conspiracy to commit bank fraud, interference with the Internal Revenue Service and conspiracy to commit interstate transportation of stolen property. In particular, the defendant, in resisting an IRS investigation, threatened IRS agents and created and sent to the agents a variety of bizarre documents captioned "Non-Statutory Abatement" and also documents that were labeled as comptroller warrants. Defendant was either a participant in or a member of a group known as the Free Men. At sentencing "based on [defendant's involvement with the terrorist activities of the Free Men," 163 F.3d at 893-94, the district court increased

For his information, Semear stated that he relied on statements provided by the FBI, agents from the ATF, conversations with detectives from the Michigan State Police, confidential sources, and on his own experience and background, which he detailed, as an ATF officer. A confidential informant ("CI"), whose identity was protected because the investigation was ongoing, offered first-hand descriptions of NAM's plans and activities which indicated he was privy to regular meetings with NAM members. The affidavit averred that all of the CI's evidence had proved reliable and had been corroborated by ATF agents. The affidavit also noted that as of April 17, 1997, an undercover ATF agent had infiltrated NAM and was providing information to government investigators.

The affidavit provided an extensive roadmap of NAM's activities. Broadly stated, these activities involved the selection of federal and state targets for attack, including television and radio stations, power stations and gas lines, and railroads and highways; participation in training for warfare; development of attack plans and target dates of attack; and the acquisition and use of a wide of variety of weapons. The undercover ATF agent described Carter as having set a target date for the offensive against the government for as early as June 7, 1997. J.A. at 152 (Affidavit ¶ 31). At one meeting, Carter outlined his plans in detail, stating that his plan was to attack the predetermined targets and create chaos for three to four days as sniper units assassinated important people and other "cells" of militia members contained a nearby army base, Fort Custer, blew up railroad yards, a federal building, and shut down radio stations. J.A. at 152 (Affidavit ¶ 32). Graham was present at several of the meetings attended by the ATF agent. J.A. at 150 (Affidavit ¶¶ 28, 36).

It is clear that the affidavit relied upon by the magistrate judge in this case more than meets the Supreme Court's standard for probable cause. A practical, common-sense reading of this affidavit based on the totality of the circumstances, including the veracity and bases of knowledge of the people supplying information, clearly compels the

conclusion that there was a fair probability that illegal weapons or other evidence of a crime would be found at Graham's home. As to the affiant's basis of knowledge, every source who supplied information to the affiant, including sources of hearsay, such as the confidential informant and the undercover ATF agent, as well as direct evidence, such as the wiretapped recordings of telephone conversations between Carter and Graham, corroborated and supported one another. These sources established the probability that Graham was directly implicated in the militia group's conspiracies; that he was actively participating in the planning of NAM's offensive; and that he possessed certain weapons.

Although Graham contends that there was no evidence that any criminal conduct was associated with his home, and that the government could have done more investigation to establish probable cause, we first note that the government need not provide "an actual showing of" criminal activity to establish probable cause. *Gates*, 462 U.S. at 243-44 n.13. As we stated previously, probable cause means only that there was a substantial chance, not an absolute certainty, of finding contraband or evidence of criminal activity at the place to be searched. Moreover, the Supreme Court has explained that seemingly innocent activity will frequently provide the basis for probable cause. *Id.*

Notwithstanding the fact that the government did not need to demonstrate conclusively that evidence of a crime would be found at Graham's home, we reject Graham's argument that there was no evidence linking criminal activity with his residence. We have emphasized that the issuing magistrate is "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (quoting *United States v. Lawson*, 999 F.2d 985, 987 (6th Cir. 1993)). In this case, there was ample evidence in the affidavit to allow the magistrate judge to draw a reasonable inference, based on the durable nature of

### 5.

This history of the evolution from no guideline on a crime involving terrorism to the present language of § 3A1.4 clearly establishes that its application should be limited to a conviction of one of the enumerated offenses in 18 U.S.C. § 2332b(g)(5)(B), coupled with detailed findings of the presence of the criminal actions of the offender of the motivating elements described in 18 U.S.C. § 2332 b(g)(5)(A). This history makes clear the errors of PSR's recommendation, the district court's findings and the majority opinion's approval of the enhancement called for by § 3K1.4 to the offenses for which Graham was convicted and particularly his conviction of the crime of conspiracy under 18 U.S.C. § 371. The application of the enhancement to the marihuana involved crimes, found in Counts Nine, Ten, and Eleven, can only be described as gratuitous. It is also worth noting that almost without exception, the statutory penalties for the offenses listed under § 2332b(g)(5)(B) are twenty years to life.

Indeed, as seen above, when Congress directed the Sentencing Commission to amend § 3A1.4 to apply to a "Federal crimes of terrorism," it did not state that the enhancement applies to offenses that "*involved*" or "*intended to promote*," rather the Sentencing Commission was directed to amend the guidelines so that the enhancement *applies only to "'Federal crimes of terrorism' as defined in section 2332b(g).* While prior directions to the Sentencing Commission used the language "involved" or "intended to promote" together with the term "international terrorism," the directions given with the enactment of section 730 of the AEDPA did not contain such language. The directions rather were to apply the enhancement to "Federal crimes of terrorism" as defined under § 2332b. However, when the Sentencing Commission promulgated the new amendment in accordance with section 730, for reasons unknown, the language "involved" or "intended to promote" remained. Thus, the district court and majority's reliance on the "intended to promote" language to effectively conclude that

1996, as set forth in Volume LI (1995) and Volume LII (1996) of the Congressional Quarterly Almanac ("Lawmakers Take Aim At Terrorism - 1995) (1995 CQ Almanac 6-18, 6-21) and ("President Signs Anti-Terrorism Bill - 1996 CQ Almanac 5-18 to 5-25). There was clearly a continuing concern in the House of Representatives over the definition of terrorism not so much as related to the direction to the Sentencing Commission, but for broader reasons – the impact the definition might have on other law enforcement efforts of the government with regard to terrorism and terrorist activity in the United States.

To approve of the action of the district court effectively labels Graham a terrorist and his activity as displayed in the record as terroristic activity, as was done by applying the § 3A1.4 enhancement, and is grossly contrary to the language of 18 U.S.C. § 2332b(g)(5) defining a "Federal crime of terrorism" as well as the Congressional intent to keep the definition narrow: "in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist, and to adequately punish the terrorist for his offense, it is appropriate to define the term." H. REP. NO. 104-383 (1995), at p. 114

Simply put, the record of the Sentencing Commission's actions in promulgating § 3A1.4 as a discrete guideline regarding terrorism and the legislative history of the statutes which mandated § 3A1.4 initially and as amended, leads to the conclusion that a conviction of one of the enumerated offenses listed in 18 U.S.C. § 2332b(g)(5) is an absolute condition precedent to the enhancement called for by § 3A1.4. Plainly, the legislative history of the statutes reflects a concern by Congress, much like the concern of the delegates to the Constitutional Convention of 1787 over the definition of "treason," that "terrorism" being a phrase which carries far-reaching connotations that is not to be used indiscriminately and must be carefully defined. *See Rumbold's Dying Speech, 1685, and Jefferson's Last Words on Democracy*, 1826, WILLIAM AND MARY QUARTERLY, 3d Ser., IX (1952), 521-531.

firearms and the ongoing nature of the alleged conspiracy, that evidence of the crime would be found at Graham's home.

The affidavit reported that Graham discussed killing people and "hitting" targets, creating the inference that he possessed the weapons that would enable him to carry out those objectives. For example, at a meeting at Carter's residence on August 15, 1997, Carter told the undercover ATF agent that Graham had been part of a "recovery team" that was to attack federal law enforcement agents and rescue NAM member Metcalf should he have been arrested when his property was searched. J.A. at 154-55 (Affidavit ¶ 39). Excerpts of taped conversations between Graham and Carter reveal Graham's willingness to shoot police officers and their families, J.A. at 158-59 (Affidavit ¶ 52-53); they implicate Graham in the plans to destroy power lines; and they reveal that he had a semiautomatic weapon ready should any federal agents come to his door, J.A. at 161 (Affidavit ¶ 58). According to the affiant's sources, Graham also confirmed possession of certain weapons. For example, on June 10, 1997, Graham informed the undercover agent that he owned a rifle and stored other firearms and ammunition at his home. J.A. at 156 (Affidavit ¶ 43). On July 27, 1997, Graham was seen with a rifle. J.A. at 157 (Affidavit ¶ 47).

The affidavit also detailed specific facts relating to the possession of machineguns. The CI observed a machinegun and ammunition at Metcalf's home on June 7, 1997, J.A. at 155 (Affidavit ¶ 41) and again on June 14, 1997, J.A. at 156 (Affidavit ¶ 44). On July 14, 1997, Graham informed the undercover agent that Metcalf had injured himself with a .50-caliber machinegun at his home while test-firing it. J.A. at 157 (Affidavit ¶ 46). While Graham was not seen with a machinegun, the facts alleged in the affidavit created the inference that he, like Metcalf, possessed such a weapon.

The search at Metcalf's property on August 13, 1997, which yielded a large cache of both legal and illegal weapons, contributed to the inference that Graham would possess such weapons. At Metcalf's home, agents discovered "all manner

of firearms, to include handguns, machineguns, silencers, shotguns, rifles, military-type semiautomatic assault weapons that could be converted to fire as automatic weapons, parts to firearms that could be used to convert otherwise lawful weapons to unlawful weapons, grenade shells that could be used to contain explosives, and black gunpowder and other chemicals and stockpiles of ammunition." J.A. at 164-65 (Affidavit ¶ 68).

Finally, Agent Semear had stated that, based on his experience and training, it was common for those who unlawfully possess firearms to maintain such firearms and records in secure locations within their residence. He also asserted that, based on his experience, he knew that "survivalists, radical militia members, and domestic terrorists tend to hold onto their firearms for long periods of time — often as long as ten or twenty years." J.A. at 176. This information, when considered with the other facts alleged in the affidavit, was more than sufficient to create a fair probability in the mind of the magistrate judge that a search of Graham's property would uncover the evidence of criminal conduct.

Although Graham claims that the affidavit could have better established whether the government had evidence that he possessed a machinegun, silencer, or other illegal destructive devices by providing, for example, first-hand observations by the undercover ATF agent, we have stated that "[t]here is no requirement of prior, actual observation of all the items listed in a search warrant." *Jones*, 159 F.3d at 974. Moreover, the search warrant was not specifically limited to these illegal weapons but was aimed at all firearms, ammunition, or destructive devices. Finally, we note that because NAM's training activities took place on Metcalf's property, the undercover ATF agent clearly had better access to Metcalf's home than to Graham's. The undercover agent was not required also to gain access to Graham's home to establish probable cause that Graham, like Metcalf, possessed illegal weapons or weapons which were evidence of Graham's participation in the conspiracy.

831 (relating to nuclear materials), 842(m) or (n) relating to plastic explosives), 844(3) (relating to certain bombings), 844(f) or (i) (relating to arson and bombing of certain property), 930(c), 956 (relating to conspiracy to injury property of a foreign government), 1114 (relating to protection of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons, 1203 (relating to injury to buildings or property within special maritime and territorial jurisdicti8on of the United States), 1366 (relating to destruction of an energy facility), 1751 (relating to Presidential and Presidential staff assassination, kidnaping, and assault), 1992, 2152 (relating to injury of fortifications, harbor defenses, or defensive sea areas), 2155 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2332c, 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture);

(ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

(iii) section 46502 (relating to aircraft piracy) or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.

### 4.

This legislative history is best read in the context of the narrative description of what took place in the Congress between introduction of The Omnibus Counterterrorism Act of 1995, H.B. 896 and S. 390, on February 5, 1995 and the enactment of the AEDPA which became law on April 24,

Amendment 539 was an emergency amendment. It was re-promulgated without change in Amendment 565, Appendix C, effective November 1, 1997.

Section 3A1.4, entitled *Terrorism*, now reads in pertinent part:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

*Commentary*

*Application Notes*:

1.   Subsection (a) increases the offense level if the offense level involved, or was intended to promote, a federal crime of terrorism. "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g).

As noted in the majority opinion, 18 U.S.C. § 2332b(g) reads in part:

(5) the term "Federal crime of terrorism" means an offense that –
(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
(B) is a violation of –
(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 relating to biological weapons), 351 (relating to congressional, cabinet, and Supreme Court assassination, kidnaping, and assault),

Graham argues that there was only a "possibility," not a "probability," that he was engaged in criminal conduct. The overwhelming weight of the information in the affidavit easily provided the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found at Graham's trailer home. The magistrate judge did not arbitrarily make a finding of probable cause, and the district court's order was therefore not in error.

### 2.  Failure to Provide a *Franks* Hearing

Graham also argues that the affidavit was insufficient to establish probable cause because it contained allegedly misleading statements and material omissions. According to Graham, paragraphs 42 and 43 of the affidavit affirmatively misled the magistrate judge. Paragraph 42 states that on June 10, 1997, the affiant contacted the National Firearms Registration and Transfer Record and found no firearms registered to Graham. It is followed by paragraph 43, which states that also on June 10, 1997, Graham told the undercover ATF agent that he owned a rifle and kept numerous firearms and ammunition at his home. J.A. at 156. Graham alleges that the inclusion and proximity of these paragraphs led the issuing magistrate to believe that Graham illegally possessed weapons which had not been properly registered, when, in fact, Graham was in legal possession of his weapons and was not required to register any of them.[8]

In addition to misleading statements, Graham argues that the affidavit contained several material omissions which were arguably exculpatory and would have "negated" probable cause had they been included in the affidavit. The allegedly material omissions reveal not only that NAM members were interested in attacking federal targets and agents but also that they held peaceful protests and demonstrations. One statement also suggests that Graham exaggerated his urge to kill federal officers and destroy federal buildings.

---

[8] Only machineguns, silencers, or other destructive devices must be registered with the National Firearms Registration and Transfer Record.

Graham sought but was denied an evidentiary hearing before the district court under *Franks v. Delaware*, 438 U.S. 154 (1978), to assess the validity of the search warrant given these alleged misstatements and omissions. The district noted that the statements at issue in paragraphs 42 and 43 were not false, and that the omitted statements occurred after Graham had confessed that he believed his phone had been tapped. The district court then determined that, even if the omitted material had been included, the magistrate judge would still have had probable cause to issue the search warrant.

We review the district court's denial of a *Franks* hearing under the same standard as for the denial of a motion to suppress: the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. *United States v. Hill*, 142 F.3d 305, 310 (6th Cir. 1998). A defendant is entitled to a hearing to challenge the validity of a search warrant if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [] the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). If, at the evidentiary hearing, "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search" suppressed. *Id.* at 156.

As to the allegedly misleading statements, the government argues that paragraphs 42 and 43 must be read in the context of paragraph 41, which reports that on June 7, 1997, the CI was at a meeting at Metcalf's home where Metcalf showed the CI a .50-caliber machinegun as well as ammunition for the gun, and informed the CI that he intended to mount the weapon, possibly in the back of his pickup truck, to use as an anti-aircraft weapon. J.A. at 155 (Affidavit ¶ 41). Paragraph 42 then logically states that:

(Emphasis added).

Section 730 reads:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism *only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.*

(Emphasis added).

As such, the Sentencing Commission promulgated Amendment 539, Appendix C, which amended § 3A1.4. The commentary states:

> This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1303. That section requires the Commission to amend the sentencing guidelines so that the adjustment in § 3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergency amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987. The effective date of this amendment is November 1, 1996.

The Sentencing Commission did not explain the distinction, if any, between "a felony involved" and a felony that "was intended to promote" "a Federal crime of terrorism." If there is a distinction, there is nothing in the legislative history, outlined above, which suggests that Congress intended a distinction.

. . .
Deletes the overly broad definition of terrorism.

Cong. Rec. December 5, 1995, H 13976. H.R. 2706 included the following:

– Section 104 defining a "Federal crime of terrorism" as now set forth in 18 U.S.C. § 2332b(g)(5)

– Section 206 continued the direction to the Sentencing Commission as set forth in Section 730 of the AEDPA

– Section 315 was deleted

The final form of what was enacted into law as the AEDPA is in Senate Bill 735 which was amended in the House of Representatives as S. 735 Effective Death Penalty and Public Safety Act of 1996 (Engrossed House Amendment). The Conference Report on S. 735, 142 Cong. Rec. H. 3305-01, stated as to Section 730, Directions to Sentencing Commission:

Section 730-Senate recedes to House amendment sections 206 and 207. This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. *This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element* to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

On June 10, 1997, your affiant contacted the National Firearms Registration and Transfer Record. They conducted a search and found no firearms registered to Bradford Metcalf. In a subsequent search, the National Firearms Registration and Transfer Record also found no firearms registered to Ken Carter or **RANDY GRAHAM**.

J.A. at 156 (Affidavit ¶ 42). Paragraph 43 then states:

Also, on June 10, 1997, the ATF undercover agent met with **RANDY GRAHAM** at the East Towne Mall in Kalamazoo, Michigan. During this meeting **GRAHAM** told the ATF Special Agent that he not only owned a rifle but had numerous firearms and ammunition stored in his residence.

J.A. at 156 (Affidavit ¶ 43). Because paragraphs 42 and 43 are neither false nor misleading, the government contends that no *Franks* hearing was warranted.

We believe that even if Graham could make a substantial showing that Agent Semear recklessly or deliberately made false statements — which he cannot because paragraphs 42 and 43 were, in fact, truthful — Graham cannot meet the second prong of the *Franks* test because the affidavit contains sufficient probable cause even when the allegedly false statements are set aside. While the proximity of paragraphs 42 and 43 could have created the false impression that not only Metcalf but also Graham possessed weapons which were not properly registered, the affidavit clearly provided a sufficient basis for the magistrate judge to find a fair probability that criminal activity or contraband could be found at Graham's trailer home even without those statements. Removing paragraphs 42 and 43 would not have affected the sufficiency of the affidavit.

As to the allegedly material omissions, we have held that omissions "are not immune from inquiry under *Franks*, [but] we have recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of

impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). Indeed, a *Franks* hearing is only merited in cases of omissions in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir.), *cert. denied*, 524 U.S. 942 (1998). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Atkin*, 107 F.3d at 1217 (internal quotation omitted). To merit a hearing, the defendant must make a preliminary showing that the affiant engaged in deliberate or reckless disregard of the truth in omitting the information from the affidavit. The court must then consider the affidavit along with the omitted portions and determine whether probable cause still exists. *Id.*

The affidavit here allegedly omitted certain statements made by Graham relating to the militia's political activity, such as protesting and demonstrating in front of a courthouse or a federal building, as well as the following two statements, the first from July 3, 1997 and the second from August 25, 1997:

> That's the way I look at it right now, it's all mind warfare. You can't shoot — you can go down to the courthouse and protest.

> [W]hy would I blow up my property? I don't want to see innocent people die, and I'm sticking up for my freedom, my rights, and my friends' rights.

Appellant's Br. at 29.

We hold that the district court did not err in concluding that these omissions did not merit a *Franks* hearing. Even assuming Graham could such show that these omissions were made in reckless disregard for the truth, the affidavit along with the omitted portions of testimony would still amply establish probable cause to believe that evidence of criminal activity or contraband was contained in Graham's home.

*Id*. at 109.

In explaining the new definition of terrorism in Section 315, the House Report stated:

> This section provides a statutory definition of "terrorism", and does so without federalizing any state crimes, and expanding the reach of the federal police power. It does not make any crime "terrorist" over which the federal government does not possess jurisdiction.

> First, this definition acts as a significant limitation on the government to prosecute individuals who might violate section 104 of this bill, when enacted. To prosecute someone under that section, the Attorney General would first have to certify that the crime was one of terrorism, as defined under this section.

> Secondly, the definition of terrorism is also important in the sentencing phase of a prosecution of federal law. The U.S. Sentencing Guidelines, in calculating the appropriate sentence to be imposed upon a convicted criminal therefore, authorizes the sentencing judge to consider the nature of the offense, and the motivation of the crime.

> So, in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist, and to adequately punish the terrorist for his offense, it is appropriate to define the term.

*Id.* at 114.

Chairman Henry Hyde of the House Judiciary Committee, in introducing a revised bill, H.R. 2706, the same day as the House Report was filed, further revising the bill set forth in the House Report, said:

> . . . today I am . . . introducing a revised terrorism bill
> . . .
> The new bill does the following

The House Report in commenting on the defintional change stated:

> Title III also establishes a new definition of terrorism that will apply to international and domestic terrorist offenses
>
> . . .
>
> It simply categorizes certain existing federal crimes as "terrorist" if motivated to affect the conduct of government or social policy.

H. REP. NO. 104-383 at p. 53 (1995).

The House Report stated as to Section 206:

> This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines to include all terrorism offenses. In amendments to the Sentencing Guidelines that became effective November 1, 1996 a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. This section of the bill will make that new provision applicable to all terrorist offenses whether international or domestic, without having to wait until November 1996 for the change to become law.

---

person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a pesron.
(IV) An assassination.
(V) the use of any –
   (a) biological agent, chemical agent, or nuclear weapon or device, or
   (b) explosive or firearm (other than for mere personal monetary gain),
   with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
(VI) A threat, attempt, or conspiracy to do any Of the foregoing.

Viewing this evidence in its totality, including the fact that several of the statements were uttered after Graham had knowledge that he was a target of the government's investigation and that his phones were tapped, the magistrate judge could easily have concluded that, despite NAM members' legitimate activities, there was probable cause to believe that NAM members were engaged in illegal activity as well. Indeed, both types of activity were consistent with NAM's guiding principles. The allegedly exculpatory statements do not "outweigh" the inculpatory ones, such as an intercepted telephone conversation between Graham and Carter on July 9, 1997, in which Graham stated, "If anybody wants to kick a door we go . . . shoot first and ask questions later . . . . I'm waiting for judgment day because they are all targets to me . . . every fucking one of them," J.A. at 159 (Affidavit ¶ 53). Therefore, the district court did not err by refusing to grant Graham a *Franks* hearing, and the denial of Graham's motion to suppress is **AFFIRMED**.

### B. Motion to Suppress Evidence from Truck

In his second assignment of error, Graham contends the district court erred by denying his motion to suppress the items seized during the warrantless search of his pickup truck. On March 18, 1998, when the government searched Graham's trailer home, federal agents also searched Graham's truck and seized an AR-15 rifle, a Beretta pistol, a bag of marijuana, and several cans of ammunition. Graham argues that the search was improper because there was no authorizing warrant, he refused to consent to the search, the officers did not have probable cause for the search, and no exception to the warrant requirement applied.

At the suppression hearing held before the district court, Agent David Smith ("Smith") testified that he was part of the team that conducted the search of Graham's trailer home. Smith had participated in monitoring the wiretapped conversations between Graham and Carter and, in preparation for the search, Smith testified that he had read the forty-page affidavit in support of the search of the house. Smith stated

that on March 18, 1998, Graham was arrested by federal agents in his pickup truck as he was pulling into his trailer park. Smith, who arrived after Graham's arrest, explained that during his search of the trailer home, he found several weapons and boxes of ammunition in Graham's bedroom. The agent noted that, in the course of his search, he found ammunition boxes for an SKS rifle and an AR-15 rifle in a closet in Graham's bedroom; he stated that he also found parts for an AR-15 or an M16 in a gun cabinet in the closet, as well as on a nearby shelf. Agent Smith testified that he did not find corresponding weapons for those boxes of ammunition or parts. The agent also described how he found several of Graham's "bug-out" lists of things to take with him in case he had to exit his trailer quickly, and one of the weapons mentioned on the list was an AR-15 rifle. At this point, the agent testified, he believed that Graham owned an AR-15 or an M16. The agent then testified that he found a manufacturer's box and ammunition for a Beretta-92 pistol in the gun cabinet in the bedroom closet, but could not find the corresponding handgun. The agent stated that he then checked with other searching officers, and none had been able to locate an AR-15, an M16, or a Beretta in Graham's trailer.

According to Agent Smith, he then asked Graham to consent to a search of a shed on his property and his truck; Graham consented to the search of the shed but refused to consent to a search of his pickup truck. Graham then gave Smith a ring of his keys and asked Smith to give the keys to a neighbor. The agent stated that he recognized the name of the neighbor as someone who was sympathetic to NAM. Smith took the keys and decided to search the truck for the missing weapons because, based on his knowledge of Graham's participation in the militia group's plans for attack, he believed that Graham was likely to keep weapons in his truck. Agent Smith also stated that he feared the neighbor or another resident of the trailer park sympathetic to the militia group would get access to weapons in the truck. With another agent, Smith then searched the truck and recovered ammunition and marijuana from the cab of the truck, and an

(1) the term "terrorism" means the use of force or violence in violation of the criminal laws of the United States or of any State, or that would be in violation of the criminal laws of the United States or of any State if committed within the jurisdiction of the United States or that State that appears to be intended to achieve political or social ends by –

  (A) intimidating or coercing a segment of the population;

  (B) influencing or coercing a government official or officials; or

  (C) affecting the conduct of a government through assassination or kidnapping;

H.R. 1710 was reported out by the House Judiciary Committee on December 5, 1995 in an amended form in H.R. 104-383. Section 104 was not changed in the amended bill and again did not contain a definition of terrorism. Section 206 was also included in the amended bill without change. Section 315, however, contained a new definition of terrorism. It incorporated as the definition Section 212(a)(3)(B)(ii) of the Immigration and Naturalization Act, 8 U.S.C. § 1182.[5]

---

[5]This section reads:

  As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

  (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

  (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

  (III) A violent attack upon an internationally protected

3.

As to the origin of the term "Federal crime of terrorism" which is found in 18 U.S.C. § 2232b(g)(5) and located in 18 U.S.C. § 2232b, part of Chapter 113B, entitled Terrorism, of Title 18 of the Untied States Code, a section which criminalizes "Acts of terrorism transcending national boundaries," one must look to the origins of the AEDPA. 18 U.S.C. § 2232b began life in H.R. 104-896, The Omnibus Counterterrorism Act of 1995 introduced in the House of Representatives on February 10, 1995, at the request of President Bill Clinton and in the Senate at the same time, as Senate Bill 104-390. This Omnibus Counterterrorism Act evolved into what eventually became the AEDPA. Section 101 of H R. 104-896 included an amendment to Chapter 113B of Title 18, United States Code in the form of Sec. 2332b making acts of terrorism which transcend national boundaries a crime. Section 101 contains generally the same language of 18 U.S.C. § 2332b, but did not provide a definition of an act of terrorism. A revised version of H.B. 896 was introduced in the House of Representatives on May 25, 1995 as H.R. 1710. What is now 18 U.S.C. § 2232b was set forth in Sec. 104 of H.R. 104-1710. Again, no definition of terrorism was included. Section 206 of H.R. 1710 did, however, contain a direction to the Sentencing Commission to amend the guidelines so that the adjustment relating to international terrorism under § 3A1.4 also applied to domestic terrorism. Section 315 of H.R. 1710 amended the definition of terrorism in 18 U.S.C. § 2331, the definitional section of Chapter 113B to read:

---

   (iii)   to affect the conduct of a government by
          assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;
. . . .

---

AR-15, a Beretta pistol, and ammunition in the covered bed of the truck.[9]

The district court determined as a matter of law that the truck search was proper despite the lack of a warrant because the searching agent had probable cause to believe he would find evidence of a crime in the vehicle. The district court found that the agent had probable cause based on the following facts: the agent had read the search warrant affidavit; he had listened to the wiretap between Graham and Carter; he had found evidence in the trailer home of Graham's possession of certain weapons but was unable to locate those weapons; he had also found other weapons in the trailer home as he had expected pursuant to the warrant; and he believed that the neighbor to whom Graham wanted to give the his keys was a militia sympathizer. Based on this finding, the district court denied Graham's motion to suppress the weapons recovered from his truck.

Graham argues to this court that because warrantless searches are presumptively illegal, the government must prove by a preponderance of the evidence that it searched pursuant to an exception to the warrant requirement. Graham then asserts that no exception to the warrant requirement applies to this case. Attempting to distinguish *California v. Carney*, 471 U.S. 386 (1985), and *United States v. Kincaide*, 145 F.3d 771 (6th Cir. 1998), two cases relied upon by the district court at the suppression hearing, Graham contends that *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), is the persuasive authority on point in this case. According to Graham, *Coolidge* is controlling because, in that case, the Supreme Court invalidated a warrantless search of a car where "the vehicle was parked, the defendant had already been removed and taken into custody, and it was not likely that the vehicle would be driven away." Appellant's Br. at 37. In this case, Graham argues, he had been removed from

---

[9] On cross-examination, the agent stated that he might have searched the truck two to three hours after he arrived at Graham's trailer home.

his truck before it was searched, the keys were not in his possession and thus the truck was not capable of movement, and the agents could have watched over the truck while they obtained a warrant.

The government counters that Graham's argument reflects a misreading of current Supreme Court precedent on the automobile exception to the Fourth Amendment's warrant requirement. According to the government, it need not prove any special "exigency" to justify a warrantless search of an automobile; the police need only have probable cause for the search. For this proposition, the government relies on *Maryland v. Dyson*, 527 U.S. 465 (1999), in which the Supreme Court explicitly rejected the contention that the police may only conduct a warrantless search of a car if they have probable cause and there is a separate finding of exigency. Because the agents in this case acted upon probable cause, the government contends, the search was proper and the district court's judgment should be upheld.

When reviewing a district court's denial of a suppression motion, we review the district court's factual findings for clear error and its legal conclusions, including its findings of probable cause, de novo. *United States v. Kincaide*, 145 F.3d 771, 779 (6th Cir. 1998). The preferable method for searching a person's private property is for the government to obtain a warrant. *United States v. Akram*, 165 F.3d 452, 456 (6th Cir. 1999). Where a law enforcement agent has no warrant to search an automobile, he may still conduct a search pursuant to the "automobile exception" if he has probable cause to believe that instrumentalities or evidence of crime may be found in the vehicle to be searched. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). We have defined probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Bennett*, 905 F.2d at 934.

The government is correct that Graham's reliance on *Coolidge* is misplaced, in light of more recent developments in the Supreme Court's jurisprudence. The automobile

and Robert S. Litt, Deputy Assistant Attorney General, Criminal Division, March 14, 1995 at p. 19-20 (emphasis in original).

Regardless, the Sentencing Commission promulgated § 3A1.4 to read:

§ 3A1.4. *International Terrorism*

(a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

*Commentary*

*Application Notes:*
1. Subsection (a) increases the offense level if the offense involved, or was intended to promote, international terrorism. "International terrorism" is defined at 18 U.S.C. § 2331.[4]

---

[4] 18 U.S.C. § 2331 reads in part:
§ 2331. Definitions
As used in this chapter –
(1) the term "international terrorism" means activities that –
   (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State:
(B) appear to be intended –
   (i) to intimidate or coerce a civilian population;
   (ii) to influence the policy of a government by intimidation or coercion; or

enhance the sentences of such defendants under this section as if they were career offenders?

60 Fed. Reg. 2441 (Jan. 9, 1996).

The Chair of the Subcommittee on Sentencing Guidelines of the Attorney General's Advisory Committee of United States Attorneys and the Deputy Assistant Attorney General of the Criminal Division of the Department of Justice responded to the Sentencing Commission's request:

> The Crime Act also requires the Commission to amend the guidelines to provide "an appropriate enhancement" for any felony that involves or is intended to promote international terrorism, unless this factor is an element of the crime. 120004 of the Crime Act. Amendment 24, however, refers to the existence of a current policy statement recommending upward departure in such cases, § 5K2.15. The amendment also inquires *whether* the guidelines should be amended to address the directive and, if so, how.

> Again, a policy statement recommending departure does not meet the statutory directive to the Commission "to amend its sentencing guidelines to provide an appropriate enhancement . . . ." Congress was presumably aware of the current policy statement, yet it mandated an amendment. Congress has thus required a guideline enhancement that specifies the consequences for any felony that involves or is intended to promote international terrorism in order to combat this serious threat to public safety.

> In sum, we urge the Commission to follow closely directives enacted by Congress relating to sentencing.

United States Sentencing Commission, Public Comment 1995 Amendment Cycle, March 1995, Statement of Jay P. McClosky, United States Attorney District of Maine, Chairman, Subcommittee on Sentencing Guidelines Attorney General's Advisory Committee of United States Attorneys

exception to the warrant requirement was based initially on a car's ready mobility and the exigent circumstances created by that mobility: probable cause clearly could develop after a car was sighted, in which case the officers might not have the opportunity to obtain a warrant without losing sight of the car; or probable cause could develop prior to sighting the car but officers could believe that the car would escape if not stopped immediately. *See Carroll v. United States*, 267 U.S. 132, 153, 154-55 (1925). Indeed, language in early Supreme Court cases appeared to require such an exigency in addition to probable cause for a warrantless search of automobile. *See Coolidge*, 403 U.S. at 478 (noting that, even where there is probable cause to search an automobile, if "police knew of the presence of the automobile and planned all along to seize it" when they arrested defendant in his home, then "there was no 'exigent circumstance' to justify their failure to obtain a warrant" and fruits of search must be suppressed); *Chambers v. Maroney*, 399 U.S. 42, 50-52 (1970) (holding that, based on automobile's ready mobility and "fleeting" opportunity to search, where officers have probable cause to search a car when it is initially stopped on the road it may also be searched without a warrant after it has been taken to the police station). Since *California v. Carney*, 471 U.S. 386, 391-92 (1985), however, when the Supreme Court articulated an additional justification for warrantless car searches, namely that a car's occupants have a lesser expectation of privacy in their car than in their home due to our society's pervasive regulation of automobiles, the necessity of a special exigency has waned.

Indeed, most recently the Supreme Court has emphasized that no special exigency is required to conduct a warrantless search of an automobile when the car is mobile and the searching officer has probable cause to believe that fruits of a crime may be present in the automobile. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The government's reliance on *Dyson* is, therefore, both appropriate and controlling. More helpful than *Dyson* for purposes of this case, however, is *Pennsylvania v. Labron*, 518 U.S. 989 (1996), *Dyson*'s precursor, which addresses directly the fact pattern in the instant case.

*Labron* consolidated two Pennsylvania cases for argument. In the second case, *Pennsylvania v. Kilgore*, No. 95-1738, the Supreme Court approved of a warrantless search of the defendant's pickup truck which occurred after the defendant's wife drove the truck to a farmhouse, entered the farmhouse to conduct a drug transaction with the defendant, and was arrested with the defendant as part of a drug sting. The Pennsylvania Supreme Court held the truck search violated the Fourth Amendment because, although there was probable cause for the search, there were no exigent circumstances justifying the failure to obtain a warrant. Reversing, the Supreme Court determined that the truck search was proper because the police had probable cause to believe there were drugs in the truck after having observed the defendant and his wife walking to and from their truck and the farmhouse. The Supreme Court held that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Labron*, 518 U.S. at 940.

The truck's "ready mobility" was not questioned, despite the fact that, as in our case, the defendants had been arrested outside of the truck and prior to the truck search. We believe the Supreme Court's reference to the truck's "ready mobility" was not, therefore, to demonstrate an "exigent circumstance," but rather to show that when the place to be searched, such as a truck, is associated with a lesser expectation of privacy than a home, the justification for a warrantless search articulated in *Carney* is satisfied provided the police have probable cause.

Even before *Labron*, this court had recognized that police may search a car without a warrant subsequent to executing a valid house search when that search has given rise to probable cause to search the car. In *United States v. Hofstatter*, 8 F.3d 316 (6th Cir. 1993), a panel of this court approved an automobile search which occurred after an authorized search of the defendants' home. The police officers in *Hofstatter* executed a search warrant on two addresses where the defendants were believed to have gone

The Sentencing Commission was not enthusiastic about the Congressional mandate. In its Analysis Of The Violent Crime Control And Law Enforcement Act of 1994 (H.R. 3355, As Passed By The Senate November 19, 1993 And By The House April 26, 1994), Part II, June 8, 1994, p. 13, the Sentencing Commission said the following about Section 120004:

> As a general principle, the Commission has opted for a more flexible guideline departure, rather than a fixed guideline enhancement where a sentencing factor is atypical or when it may arise during the course of a wide range of offenses of varying seriousness or in many forms. In such situations it may be difficult to arrive at a fixed formula in calibrating the seriousness of the fact with that of the underlying offense, although the factor nevertheless may be an important sentencing consideration for the court.

The Sentencing Commission solicited comment on the Congressional mandate, as follows:

> 24. *Issue for Comment*: Section 120004 of the Violent Crime Control and Law Enforcement Act of 1994 directs the Commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism (unless such involvement or intent is itself an element of the crime). Considering the existing policy statement in § 5K2.15 recommending an upward departure in such cases, the Commission invites comment on whether, and if so how, the guidelines should be amended to address this directive appropriately. For example, should the Commission add an adjustment to Chapter Three that would apply to all Chapter Two offenses and that would prescribe a specific increase in offense level if the offense involved or was intended to promote terrorism? If so, what level of enhancement would be appropriate? Or, should the Commission amend § 4B1.1 (Career Offender) to

*Kikumura*, 706 F. Supp. 331 (D. N.J. 1989).[3]　The effective date of this amendment is November 1, 1989.

However, the Sentencing Commission was directed by § 120004 to provide a new terrorism enhancement, which it did by promulgating § 3A1.4.　In the commentary to Amendment 526, Appendix C, which promulgated § 3A1.4, the Sentencing Commission stated:

Section 120004 of the Violent Crime Control and Law Enforcement Act of 1994 directs the commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism.　The amendment addresses this directive by adding a Chapter Three enhancement at § 3A1.4 (International Terrorism) in place of the upward departure provision at § 5K2.15 (Terrorism).　The effective date of this amendment is November 1, 1995.

---

[3]*United States v. Kikumura*, 706 F. Supp. 331 (D. N.J. 1989), decided February 10, 1989, involved the sentencing of a member of the Japanese Red Army who was captured with explosives. The district court found that Kikumura had meticulously planned, schemed and attempted to execute a terrorist mission in the United States. The guidelines scored Kikumura's offense conduct at 18 and because he had no prior criminal history the guideline range for his offense of conviction was 27-33 months. The district court departed upward to 30 years. The district court explained:

In point of fact, the Guidelines do not consider terrorism or conduct remotely similar to that of Kikumura.　Here, because Kikumura intended to cause death and horrible injury, a departure from the guidelines is warranted.　Moreover, because the defendant's bombs were intended to cause multiple deaths and injuries, as did the Naples bomb, greater departure is warranted.　The dangerousness of the bombs, disruption of governmental function and extreme conduct are obvious.

706 F. Supp. at 340. In 1990, subsequent to the adoption of § 5K2.15, the Court of Appeals for the Third Circuit vacated the sentence and remanded with instruction to the district court to more particularly describe the basis for the upward departure with regard to the factors it considered and directed that the facts to support the departure be established by clear and convincing evidence. *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990).

after picking up ingredients for their drug manufacturing business; the officers then searched one defendant's car, which had been used the day before in a controlled drug buy and was parked in the driveway of the premises. Incriminating evidence was seized from the car.　We upheld the search based only upon the officers' probable cause, without any discussion of exigent circumstances or the car's mobility, stating that "[a]lthough the government might have had time to secure a warrant to search the automobile, there was no requirement that it do so." *Hofstatter*, 8 F.3d at 322.

In this case, the district court did not err by finding that the agents had probable cause to search the truck.　The district court relied upon the applicable principle of law, namely that a vehicle may be searched, without any indication of exigency, if the searching officers have probable cause to believe that it contains instrumentalities or evidence of the crime. Moreover, the district court's findings of fact were not clearly erroneous: all factual findings were directly supported by Agent Smith's testimony.　The district court properly viewed the search of the truck in light of the allegations in the search warrant affidavit and the agents' search of the trailer home.[10]　Graham was suspected of participating in a conspiracy to lead a violent offensive against the government and its agents and officers. Agent Smith, who testified that he had monitored the wiretapped conversations between Graham and Carter and had read the search warrant affidavit the day of the search, knew that Graham was suspected of participating in the conspiracy and that as part of the conspiracy he was amassing weapons and ammunition.　In addition to the fact that Agent Smith had been briefed that members of militia organizations collect firearms and that

---

[10]It is not the case, however, as the government argued, that the affidavit for the search warrant to search the home would have provided probable cause to search Graham's truck.　Once the officers failed to conduct a search of the truck incident to Graham's arrest, we believe the officers only "regained" authority to search the truck because they independently developed probable cause in the course of their search of the trailer home.

Graham might carry weapons in his truck, the agent found strong evidence in the trailer indicating that an assault rifle and a Beretta pistol were unaccounted for during the search. J.A. at 743-44. The agent's belief that several weapons were outstanding was reasonable, and there was a fair probability that those weapons would be found in Graham's truck; therefore, Agent Smith had probable cause to believe that Graham's truck contained contraband or evidence of a crime.[11] Contrary to Graham's assertion, the agent did not need to find a magistrate and obtain a search warrant for the truck; the agent's belief that there was probable cause to search the truck and the truck's mobility were sufficient to justify the search. Therefore, we **AFFIRM** the district court's denial of Graham's motion to suppress the evidence recovered from the pickup truck.

## C. Severance of Counts

Graham's third assignment of error is that the district court erred when it failed to grant his motion to sever the drug-related counts, Counts 10, 11, and 14, from the firearm-related counts pursuant to Fed. R. Crim. P. 14. Count 10 alleged that Graham unlawfully attempted to manufacture

---

[11]The agent also stated that fear for his safety and that of his fellow officers contributed to his decision to search Graham's truck. Although the officers need not have an exigent circumstance such as fear for their own safety to conduct a search pursuant to the automobile exception, it is unclear whether the agent's fear would create an exigent circumstance sufficient to permit a warrantless search of the automobile. On the one hand, Graham had already been placed in handcuffs when the agents decided to search the truck and could no longer legitimately be considered a threat to them. Although Graham had asked that his truck keys be given to a neighbor who was a suspected militia sympathizer, there is no evidence in the record whether FBI procedure would have permitted the agents to give the keys to the neighbor, or whether the vehicle would have to be impounded. On the other hand, we note that there might have been multiple sets of keys to the truck, and the agent might have believed that a sympathizing neighbor possessed one of those sets and could gain access to the truck. Because the agent had sufficient probable cause to search without the "reasonable fear" factor, we need not resolve this issue.

Prior to the enactment of § 120004, the Sentencing Guidelines contained a provision under U.S.S.G. § 5K2.15, relating to terrorism, which read:

> § 5K2.15. *Terrorism* (Policy Statement)
>
> If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range.

Terrorism and terroristic action were not defined.

The Sentencing Commission said in the commentary to Amendment 292, Appendix C, which promulgated § 5K2.15:

> 292. Chapter Five, Part K, Subpart 2, is amended by inserting an additional policy statement as § 5K2.15 (Terrorism (Policy Statement)).
>
> The purpose of this amendment is to add a specific policy statement concerning consideration of an upward departure when the offense is committed for a terroristic purpose. This amendment does not make a substantive change. Such conduct is currently included in the broader policy statement at § 5K2.9 (Criminal Purpose) and other policy statements. *See United States v.*

amending the Omnibus Crime Control and Safe Streets Act of 1968 to, among other things, provide increased penalties for terrorist crimes. On March 12, 1991, the Senate introduced S. 635, entitled the Comprehensive Violent Crime Control Act of 1991. Under Title VII, Terrorism, Subtitle D-Terrorism Offenses and Sanction, Section 738 contained directions to the Sentencing Commission, as follows:

> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an increase of not less than three levels in the base offense level for any felony, whether committed within or outside of the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element or the crime.

*See* S. 738, 102d Cong. § 738 (1991). The House Bill, H.R. 1400, contained a similar provision.

### 2.

No further action was taken by Congress until Congress began consideration of the Violent Crime Control Act of 1994, which originated in H.R. 103-3355, introduced October 26, 1993. When the Senate considered H.R. 103-3355 for passage, it amended the bill to incorporate language from the S. 1607, the counter-part to 3355. Senate Bill 1607 contained the language that became § 120004, which reads:

SEC. 120004. SENTENCING GUIDELINES INCREASE FOR TERRORIST CRIMES.

> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

marijuana; Count 11 alleged that Graham unlawfully conspired to manufacture marijuana; and Count 14 alleged that Graham knowingly used and carried a firearm during and in relation to a drug trafficking crime, namely his attempt and conspiracy to manufacture marijuana as charged in Counts 10 and 11. Graham claims that his attempt or conspiracy to grow marijuana had nothing to do with the conspiracy charged in Count 1 or the other offenses in Counts 3, 4, 5, 9, and 13 because the members of NAM did not finance their activities with the sale of marijuana.

Fed. R. Crim. P. 8(a) provides that two or more offenses may be charged in the same indictment:

> [I]f the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

FED. R. CRIM. P. 8(a). The district court found that, based on the grand jury's indictment, the conspiracy to manufacture marijuana was part of "a common scheme or plan" to sell drugs to finance violence. Moreover, the district court found that the firearms were related to the drug crimes in that they were allegedly used or carried in connection with the drug crimes. J.A. at 219. Concluding that introduction of the evidence relating to the drug counts would not unduly prejudice Graham, the district court denied Graham's motion to sever the counts.

Joinder of the counts under Rule 8(a) was proper in this case. Relying on the language of the Rule, we have observed that "joinder under this subsection is permissive." *United States v. Wirsing*, 719 F.2d 859, 862 (6th Cir. 1983). The district court may, to the extent it is consistent with due process principles, construe the Rule broadly to "promote the goals of trial convenience and judicial efficiency." *Id.* In this case, the indictment specifically averred that "members [of NAM] planned to finance their organization by engaging in narcotics trafficking." J.A. at 79 (Superseding Indictment). Moreover, Count 9 of the indictment charged Graham with

possession of a firearm while being a user of an illegal substance in violation of 18 U.S.C. § 922(g). The government necessarily had to prove Graham's marijuana use in order to establish the elements of this charge.

We have affirmed that "[w]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *Wirsing*, 719 F.2d at 863 (quotation omitted). In this case, William Huggett, who was Graham's partner in drug trafficking, testified in great detail about Graham's history of marijuana use and the growing operation that he ran with Huggett. Huggett's testimony also established the time frame when he and Graham first became involved in militia activities and the extent of Graham's participation in NAM, including Graham's recruitment of members, his discussions of target lists, and his preparation for battle. Moreover, as the government noted, Huggett's testimony about the government's seizure of Graham's marijuana plants in 1997, which helped to prove the drug counts, also established motive for Graham's distrust of the government, which explained Graham's participation in the broader conspiracy.

Other trial testimony, particularly that of the agents who searched Graham's residence, established that Graham kept his guns and drugs together. To require the government to put on a separate trial to prove conspiracy to manufacture marijuana, attempt to manufacture marijuana, and knowingly carrying a firearm in relation to a drug trafficking crime, where the evidence for those counts is duplicative of evidence relating to other counts in the indictment, would violate the spirit of Rule 8(a), which is to "promote the goals of trial convenience and judicial economy." *Wirsing*, 719 F.2d at 862. Therefore, we hold that joinder of the counts was proper under Rule 8(a).

We also hold that the district court did not abuse its discretion by refusing to grant Graham a severance under Fed. R. Crim. P. 14. Even when joinder is appropriate under Rule 8(a), a district court may, in its discretion, grant the defendant

### III. Analysis

### A. The Legislative History

#### 1.

The legislative history of 18 U.S.C. § 2232b(g)(5) and the Antiterrrorism and Effective Death Penalty Act of 1996, (AEDPA), Pub. L. 104-132, 110 Stat. 1214, which under Section 730, directed the Sentencing Commission to promulgate § 3A1.4, and can be traced at http://thomas.loc.gov, supports my view that the § 3A1.4 enhancement is offense specific and can only be applied if there is a conviction of one of the offenses enumerated in 18 U.S.C. § 2232b(g)(5)(A). This history shows a particular concern by the Congress that the "Federal crime of terrorism" enhancement is to be applied only in a narrow set of circumstances. This history must be viewed particularly in light of the fact that, until recently,[2] there was no federal law that makes a domestic act of terrorism as such a crime.

As will be explained below, the two statutes from which § 3A1.4 and the term "Federal crime of terrorism" are derived are the Violent Crime Control and Law Enforcement Act of 1994 (Violent Crime Control Act), Pub. L. 103-322, Title XII, § 120004 and Sections 703 and 730 of the AEDPA. Prior to 1994, indeed as early as 1991, Congress was working on

---

[2]Prompted by the events of September 11, 2001, Congress enacted the Uniting and Strengthening American by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001. The USA PATRIOT Act added to the criminal code two new federal crimes relating to terrorism. Under section 801, Chapter 97 of title 18, United States Code, was amended to include a crime for "Terrorist attacks and other acts of violence against mass transportation systems," prescribing a penalty of 20 years imprisonment, or life (if the offense was an "aggravated offense" as further defined). Section 803 contains a new crime for "Harboring or concealing terrorist," prescribing a penalty of 10 years imprisonment. As further stated *infra*, this case was submitted on appeal prior to the events of September 11, 2001 and Graham's actions depict grossly less offensive, and qualitatively different, conduct than that displayed on September 11, 2001.

18 U.S.C. § 924(c)(1).  Metcalf, again representing himself, appealed his conviction.  Metcalf's conviction was affirmed in an unpublished opinion, *United States v. Metcalf*, No. 99-1667, 2000 WL 924171 (6th Cir. June 28, 2000).  There is no mention in this decision of the § 3A1.4 enhancement; apparently Metcalf did not claim error because of application of the enhancement.

### 4.  Overall

Application of the § 3A1.4 enhancement is not supportable on the record of Graham's case.  There is no justification for its application to Graham for any of the offenses of which he was convicted, particularly in light of the district court's treatment of Carter who was described in the indictment as commanding officer and leader in the formation of the North American Militia.  Surely, whatever consideration Carter was entitled to for pleading guilty and fully cooperating, if his offenses involved or were intended to promote a federal crime of terrorism as the Offense Level 38, Criminal History VI in the Guideline Range Determined by the Court stated in his Judgment In A Civil Case, approving a plea agreement which limited his sentence to 60 months was a recognition of the fact that the district court did not believe that Carter committed a "Federal crime of terrorism."  The government also did not consider Carter a terrorist as evidenced by his plea agreement.

Likewise, the government did not view Graham as committing a "Federal crime of terrorism" until it received the PSR, which does not support the enhancement other than simply applying it.  Lastly, the district court findings at Graham's sentencing did not justify application of § 3A1.4.  Simply put, applying the § 3A1.4 enhancement did a gross wrong to Graham.

a severance if it appears that the defendant is prejudiced by the joinder of the offenses.  Fed. R. Crim. P. 14.  The district court's discretion, which is due substantial deference from this court, "must be exercised in light of all the relevant circumstances.  Foremost among the relevant circumstances is a balancing of the interest of the public in avoiding a multiplicity of litigation and the interest of the defendant in obtaining a fair trial."  *Wirsing*, 719 F.2d at 864-65.

In *Wirsing*, one of the few cases in which an appellate court ordered severance pursuant to Rule 14, a panel of this court found that while the allegations of a conspiracy to traffic in drugs and tax evasion from the drug money were properly joined under Rule 8(a), the district court should have granted a severance because the defense attorney was unprepared to challenge the complex tax evasion charges.  *See id.* at 865.  We concluded that there was a prejudicial "spillover effect" from the tax evasion charges to the drug conspiracy charge due to defense counsel's unpreparedness, which prejudiced the defendant's right to a fair trial.  *Id.*

In this case, in contrast, Graham cannot point to any specific prejudice he suffered from the joinder of Counts 10, 11, and 14 with the other counts of the indictment.  Graham does argue that there was no evidence to connect his marijuana operation with NAM activities.  Even if this were so, which the government disputes, the fact that the government was unable to prove a certain aspect of the conspiracy does not prove that Graham suffered "substantial prejudice" from the joinder of the counts.  Graham also claims that "when the jury was presented with both guns and drugs, actual prejudice resulted to Mr. Graham in the form of a guilty verdict regarding Count 1 even though no threats were made or any violent action taken."  Appellant's Br. at 39.  Graham's argument is no more than that the jury was overwhelmed with evidence of Graham's bad acts and could not distinguish between the conspiracy count and the drug counts.  Significantly, however, Graham does not challenge his conviction on Count 1 for sufficiency of the evidence.  Claiming that the jury was "overwhelmed" is not evidence of

substantial prejudice. Indeed, proof that the jurors were able to distinguish between the drugs and weapons evidence is the fact that they acquitted Graham of Counts 3, 4, and 5.

The district court did not abuse its discretion by failing to grant Graham a severance under Rule 14. The drug counts and the firearm counts were manifestly related, and the introduction of evidence on all counts did not prejudice Graham. We therefore reject his claim of error.

## D.  Application of U.S.S.G. § 3A1.4 to Sentence

Graham's fourth assignment of error presents an issue of first impression in our court, namely when may a district court apply Sentencing Guideline § 3A1.4, the domestic terrorism enhancement, to a defendant's sentence. There is a paucity of case law and scholarly work on this section of the Guidelines.[12] We review a district court's interpretation and application of the Guidelines de novo, but limit our review of its factual findings to determine whether they were clearly erroneous. *United States v. Jeter*, 191 F.3d 637, 638 (6th Cir. 1999).

Section 3A1.4 provides:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

---

[12]Other courts of appeals have mentioned § 3A1.4 in their opinions, *see United States v. Nichols*, 169 F.3d 1255, 1270 n.3 (10th Cir. 1999) (noting that, but for ex post facto problems, § 3A1.4 adjustment would apply to defendant's conviction for conspiring to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, an enumerated "Federal crime of terrorism"); *United States v. Leahy*, 169 F.3d 433, 446 (7th Cir. 1999) (rejecting district court's upward departure based on analogy to § 3A1.4 because defendant did not seek "to influence or affect the conduct of the government" as required by the statute), although none have addressed the question of its application to a § 371 conspiracy, as in this case.

co-defendant were not able to follow through with their plans to disrupt government functions, destroy communications and public highways, and threaten to and/or assault federal officers and employees.

(JA at 1436)

The district court at sentencing did not particularize the facts supporting a finding that the elements of 18 U.S.C. § 2332b(g)(5)(A) were present, stating only

His crime was calculated to influence and retaliate against the United States government.

(JA at 1405)

The district court's justification for finding the elements of 18 U.S.C. § 2332b(g)(5)(A) were present generally followed the reasoning of the majority opinion with considerably less sophistication. The district court imposed a sentence of 660 months of which 360 months were for the convictions under Count One, Nine, Ten, and Eleven. The details of the sentence, including guideline scoring with and without the § 3A1.4 enhancement are set forth in Appendix A. As noted in Appendix A, the district court exceeded the 60 month statutory maximum under § 371 because the statutory maximums for the convictions on Counts Ten and Eleven were 480 months. Achieving a 360 month sentence for Counts One, Ten, and Eleven in the fashion of the district court is questionable in all events.

### 3.  Metcalf

Metcalf went to trial separately representing himself. He was convicted in all of the counts of the superceding indictment in which he was charged. As in Graham's case, the PSR recommended the § 3A1.4 enhancement. Metcalf received an aggregate sentence of 480 months, of which 120 months was consecutive because of his conviction on Count 12, carrying a firearm, a semi-automatic assault weapon, during and in relation to a crime of violence, in violation of

Earlier, Graham filed several objections to the PSR's application of the § 3A1.4 enhancement. Graham's objection relating to the application of U.S.S.G. § 3A1.4 and the PSR's response are found in the PSR as follows:

> Mr. Graham objects to the application of the adjustment for Terrorism. Pursuant to U.S.S.G. § 3A1.4(a) and (b). He argues the Terrorism application is not valid, as he has not been convicted of any crimes set forth in 18 U.S.C. § 2332(b)(g). Mr. Graham concedes he had private conversations in which he spoke harshly about the government and, at times, vented in a private conversation to a friend. During these conversations, he was exercising his right to hold unpopular believes and harsh views about the federal government. Mr. Graham maintains these private conversations with friends were protected speech, pursuant to the First Amendment of the U.S. Constitution.
>
> Mr. Graham also argues he never acted out violently damaged government property, or attempted to damage government property.
>
> Response
>
> The presentence investigator believes this victim related adjustment has been correctly applied. Mr. Graham, Bradford Metcalf, and Ken Carter conspired to commit offenses against the United States as discussed in Count One of the Superseding Indictment and the Offense Conduct section of this report. Mr. Graham's jury found him guilty of this offense. Some of those offenses are listed in 18 U.S.C. § 2332b(g).

(JA at 1455)

Graham's response must be compared to the PSR's finding under the heading Victim Impact which stated:

> There are no specific victims who have suffered the consequences of Mr. Graham's actions, Mr. Graham and

(b) In each such case, the defendant's criminal history category from Chapter Four . . . shall be Category VI.

Application note 1 to the Guidelines instructs us that a "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g). Turning to the statute, the term "Federal crime of terrorism" is defined in the conjunctive: it is "an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), *and* is a violation of one of the enumerated statutory provisions provided in § 2332b(g)(5)(B).[13]   Graham argues that the district court

---

[13] Section 2332b(g)(5)(B) lists the following offenses:

(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 (relating to biological weapons), 351 (relating to congressional, cabinet, and Supreme Court assassination, kidnapping, and assault), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(e) (relating to certain bombings), 844(f) or (i) (relating to arson and bombing of certain property), 930(c), 956 (relating to conspiracy to injure property of a foreign government), 1114 (relating to protection of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1361 (relating to injury of Government property or contracts), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366 (relating to destruction of an energy facility), 1751 (relating to Presidential and Presidential staff assassination, kidnapping, and assault), 1992, 2152 (relating to injury of fortifications, harbor defenses, or defensive sea areas), 2155 (relating to destruction of national defense materials, premises, or utilities), 2156 (relating to production of defective national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts

improperly applied the adjustment because he did not commit a "Federal crime of terrorism" as defined by the statute.

The district court applied the terrorism adjustment to Graham's sentence for his conviction on Count 1, a conspiracy in violation of the general conspiracy statute, 18 U.S.C. § 371. Graham's § 371 conviction was premised on the following substantive offenses: to possess machineguns, in violation of 18 U.S.C. § 922(o)(1); to threaten to assault and murder federal officers and employees, in violation of 18 U.S.C. § 115(a)(1)(B); to forcibly assault, resist, oppose, impede, intimidate, and interfere with federal officers when they were engaged in their official duties, in violation of 18 U.S.C. § 111; and to maliciously damage and destroy and attempt to damage and destroy by means of an explosive any building, vehicle, or other real or personal property used in interstate commerce, in violation of 18 U.S.C. § 844(i).[14]

At the sentencing hearing, the district court addressed Graham's objection to the terrorism enhancement. In its discussion of the Guidelines provision and the applicable statute, the district court cited the following enumerated offenses in § 2332b(g)(5)(B) as relevant to its sentencing determination: 18 U.S.C. § 32 (relating to destruction of

---

of terrorism transcending national boundaries), 2332c, 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture);

(ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

(iii) section 46502 (relating to aircraft piracy) or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.

[14] Because of the way the jury instructions were phrased, we know only that the jury found Graham guilty of conspiring to achieve at least one of the objects of the conspiracy named in the indictment, but we do not know which one.

---

against Graham: Count Thirteen, which charged him with carrying a semi-automatic weapon in relationship to a crime of violence, in violation of 18 U.S.C. § 924(c)(1), and Count Fourteen, which charged him with carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(C)(1). These offenses carried mandatory consecutive sentences of 20 years and 5 years, respectively.

Graham went to trial. The results are described in the majority opinion and need not be repeated here. Importantly, as noted by the majority, the jury returned a *general* verdict on Count One so there is no way of knowing which of the four objects of the conspiracy charged in Count One it found were proved beyond a reasonable doubt. Likewise, the jury made no specific findings regarding the number or marihuana plants which were involved in Counts Ten and Eleven.

The first reference to a § 3A1.4 enhancement of Graham's Offense Level computation on the offenses for which he was convicted appears in his PSR without any discussion or justification for making the adjustment. The PSR recommended application of the § 3A1.4 enhancement to Count One and also recommended it be applied to Counts Nine, Ten and Eleven even though the offenses charged in Counts Nine, Ten and Eleven are not mentioned in 18 U.S.C. § 2332b(g)(5)(B). The government's sentencing memorandum filed four days before the date sentence was imposed does not contain any reference to the PSR recommendation of the § 3A1.4 enhancement other than to state:

Based on his independent investigation and application of the Sentencing Guideline to the totality of facts in this case, the Probation Officer recommended a sentence of 55 years imprisonment for Mr. Graham. The United States agrees with this recommendation as one necessary to fully meet the policies underlying federal sentencing.

*See* Government's Sentencing Memorandum, Docket Entry 236, at p. 10.

other counts against Carter. This meant that Carter's sentence was limited to 60 months, the statutory maximum for a violation of § 371, and this was the sentence Carter received. The plea agreement described in detail, however, the predicted sentencing guidelines for each of the offenses for which Carter was indicted, including the Base Offense Level and increases in this level because of the Specific Offense Characteristics of each offense. Nowhere in the predicted sentencing guidelines is there a reference to an enhancement under § 3A1.4. Apparently at that time, the government did not believe that such an enhancement was appropriate. However, Carter's Presentence Investigation Report (PSR) and the Guideline Range Determination By The Court part of Carter's judgment, set the Total Offense Level at 38 and the Criminal History Category at VI. This computation included the § 3A1.4 enhancement. The Judgment In A Criminal Case stated "The sentence departs from the guideline range because the count of conviction carries a five year maximum statutory penalty" and also stated:

> The Court recommends to the Bureau of Prisons that the defendant be placed in a less security facility than may be indicated by criminal history category VI since, in fact, his true criminal history category is I.

## 2. Graham

Graham initially negotiated a plea agreement substantially similar to that of Carter. On Graham's plea of guilty to Count One, the 18 U.S.C. § 371 conspiracy count, which of course limited his sentence to 60 months, the remaining counts against him were to be dismissed. Graham's plea agreement, like Carter's, included predicted sentencing guidelines for each of the offenses on which he was indicted. The predicted sentencing guidelines made no mention of an enhancement under § 3A1.4. However, on the day scheduled for his plea, Graham declined to plead, thus aborting the plea agreement.

On July 9, 1998, the grand jury returned a superceding indictment against Carter and Metcalf. Carter was dropped from the superceding indictment and two counts were added

aircraft or aircraft facilities); § 844(i) (relating to malicious destruction of property used in interstate commerce by explosives); § 1114 (relating to protection of federal officers); § 1362 (destruction of communication lines and radio stations); § 1366 (destruction of property at an energy facility); and § 2155 (destruction of and conspiracies to destroy national defense materials). In determining that the adjustment was properly applied to Graham's sentence, the district court then stated that "[s]ection 3A1.4 makes this victim adjustment applicable to not only the federal crimes of terrorism listed [in the statute] but [to] other offenses intended to promote . . . the commission of a list of federal crimes of terrorism." J.A. at 1405. According to the district court, the facts alleged in Graham's trial demonstrated that his participation in the § 371 conspiracy was intended to promote "the above mentioned crimes of terrorism listed in the statute." J.A. at 1405. Based on that conclusion, the district court rejected Graham's objection to the sentencing adjustment.

Similar to the district court's analysis, the government argues that Graham's § 371 conviction is sufficiently analogous to several of the enumerated sections in § 2332b(g)(5)(B) so as to make the sentencing adjustment appropriate.[15] The government urges that "[t]he fact that

---

[15] The government claims that Graham's conspiracy encompassed the following conduct listed in § 2332b(g)(5)(B) (but not listed in the indictment) such that Graham's conspiracy was "intended to promote" a "federal crime of terrorism:" (1) 18 U.S.C. § 844(e) (using the mail or telephone to willfully make a threat concerning an attempt to kill, injure, or intimidate a person or to damage or destroy a building, vehicle, or real or personal property by means of fire or an explosive); (2) 18 U.S.C. § 844(f)(1) (maliciously damaging or destroying with an explosive government property); (3) 18 U.S.C. § 1114 (killing or attempting to kill an officer or employee of the United States while that person is engaged in performing or on account of the performance of official duties); (4) 18 U.S.C. § 1362 (willfully or maliciously injuring or destroying or attempting to destroy government-owned or operated means of communication); (5) 18 U.S.C. § 1366 (knowingly damaging or attempting to damage an energy facility); and (6) 18 U.S.C. § 2155 (willfully injuring or attempting to injure or conspiring to injure national

Defendant was charged and convicted of a conspiracy to commit these terrorist acts under different statutes, rather than the specific offenses enumerated in the statute cited in the commentary, should not be fatal to application of the guideline." Appellee's Br. at 61.

Our first task is to determine whether § 3A1.4 may be applied to a sentence for conviction of the general conspiracy statute, which is not mentioned in § 2332b(g)(5)(B).[16] Noting that there is no applicable case law to assist us,[17] we turn to the language of the Guidelines and analogous provisions for guidance. Section 3A1.4 provides that, in order for the upward adjustment to apply, the offense must be a felony that either "involved" or "was intended to promote" a federal crime of terrorism. The word "involved" occurs frequently throughout the Guidelines, both in the substantive provisions and in the commentary, and is typically employed to mean "included." *See, e.g.*, U.S.S.G. § 1B1.1 cmt. n.1(j) (1998) (noting that "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242"); § 2A2.2 cmt. n.1 ("'Aggravated assault' means a felonious assault that involved (A) a dangerous weapon with intent to do bodily harm (i.e., not merely to frighten), or (B) serious bodily injury, or (C) an intent to commit another felony");

---

defense materials, premises, or utilities).

[16]We note that Graham was sentenced using the November 1, 1998 Guidelines because that was the version in effect on the date of sentencing. According to Appendix C of the Guidelines, § 3A1.4 became effective November 1, 1996. The conspiracy alleged in this case was a continuing offense which occurred from the summer of 1996 through Graham's arrest in August 1998. Because the crimes continued after the effective date of the amendment, the application of the adjustment does not present retroactivity problems. *See United States v. Buckner*, 9 F.3d 452, 454 (6th Cir. 1993).

[17]None of the cases discussed in the dissent address the question before us. *See* note 12 *supra* (explaining that other cases mentioning § 3A1.4 involve different issues).

These are, in summary, the considerations which compel my dissent. They will be discussed in detail below.

## II. Background[1]

### A. The Indictment

Randy Graham, Bradford Metcalf and Ken Carter were indicted on April 9, 1998. The majority opinion describes the various charges against the three and they need not be repeated here. Significant in the language of the indictment is the following:

– Carter was the commanding officer and leader in the formation of the "North American Militia."

– Metcalf was also a leader.

– Graham "executed various tasks assigned to him by Carter."

– Thirty Overt Acts are described. Carter is named alone in nine of them. Metcalf alone is named in six. Graham alone is named in two. All three are named in one. Graham and Carter are named in three. The other Overt Acts name Carter and Metcalf. Of the thirty Overt Acts described in the indictment, Graham is named in only six.

### B. The Sentences

#### 1. Carter

Carter quickly pleaded guilty to Count One of the Indictment, the 18 U.S.C. § 371 conspiracy count, under a plea agreement which required complete cooperation. Under the plea agreement, the government agreed to dismiss the

---

[1]To the extent that this dissent refers to documents not contained in the Joint Appendix, such materials are found in the district court's record.

- In sentencing the defendant under §3A1.4 we hold that the district court must, however, identify which enumerated "Federal crime of terrorism" the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record.

It is not which enumerated "Federal crime of terrorism" the defendant intended to promote that must be identified, but rather of which of the offenses in 18 U.S.C. § 2332b(g)(5)(B) that defendant was convicted. An enhancement under § 3A1.4 is an interpretive exercise only to the extent that conviction of an enumerated crime was motivated by the elements of 18 U.S.C. § 2332b(g)(5)(A). Additionally, in all events, application of a guideline enhancement of some 250 months requires more than a finding by a preponderance of the evidence. At a minimum, the evidence should be clear and convincing if not beyond a reasonable doubt.

- [T]he district court's determination that the defendant's § 371 conspiracy was "intended to promote" a federal crime of terrorism, in particular the crime of maliciously damaging or destroying, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce, was not error.

The enumerated offense listed under 18 U.S.C. § 2332b(g)(5)(B) described in this statement is 18 U.S.C. § 844(i). Defendant was not convicted of violating 18 U.S.C. § 844(i) or attempting to do so in violation of 18 U.S.C. § 2. Moreover, a conviction under 18 U.S.C. § 844(i) only becomes a "Federal crime of terrorism" if it was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A). The district court's findings fall woefully short this standard. The district court's particular findings lack any details from the trial record which would support the additional finding beyond a reasonable doubt.

§ 2B3.2(b)(1) (stating that, for the offense of extortion by force, "[i]f the offense involved an express or implied threat of death, bodily injury, or kidnapping, increase by **2** levels"); § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels"). Based on its usage throughout the Guidelines, we believe that in the context at hand, the word "involved" signifies that a defendant's offense included a federal crime of terrorism; in other words, that a defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5).

In our case, the district court chose to rely on the "intended to promote" language in sentencing Graham. Therefore, we turn our analysis to that prong of the guideline. We begin with the assumption that the "intended to promote" language means something different from the word "involved." A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism. On this reading, the offense of conviction itself need not be a "Federal crime of terrorism."

This interpretation of the phrase "intended to promote" is in harmony with the fact that, pursuant to U.S.S.G. § 1B1.3, a defendant's base offense level may be adjusted for acts which the defendant did not necessarily commit but were committed by others in furtherance of a jointly undertaken criminal activity with the defendant and were reasonably foreseeable to the defendant in connection with that activity. *See* U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.2. These acts are not necessarily the same as those for which the defendant may be held liable as a principal, accomplice, or conspirator. *See id.*, cmt. n.1.

The district court held, as a matter of law, that "[s]ection 3A1.4 makes this victim adjustment applicable to not only the

federal crimes of terrorism listed [in the statute] but [to] other offenses intended to promote . . . the commission of a list of federal crimes of terrorism." J.A. at 1404-05. Based on our interpretation of the word "involved" and the phrase "intended to promote," as well as our understanding of the relevant conduct provision, we believe that this statement of law is correct: the defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime.[18]   In sentencing the defendant under § 3A1.4, we hold that the district court must, however, identify which enumerated "Federal crime of terrorism" the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record. *See United States v. August*, 984 F.2d 705, 714 (6th Cir. 1992) ("[T]his circuit has held numerous times that the

---

[18]Under our interpretation of the "intended to promote" prong of § 3A1.4, the application of the terrorism enhancement does not hinge upon whether the object crime alleged in the conspiracy charge is one of the crimes enumerated in § 2332b(g)(5). Therefore, there is no need to find that the defendant conspired to commit any one of the object crimes alleged in Count 1. *See* U.S.S.G. § 1B1.2, commentary, applic. note 5 (applic. note 4 in current Guidelines Manual). Section 1B1.2(d) provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." The commentary cautions that

> [p]articular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2, commentary, applic. note 5. In this case, all the object crimes alleged in Count 1 were part of a broader conspiracy "intended to promote" enumerated crimes of terrorism. The terrorism enhancement applies no matter which object crimes were assumed in the guilty verdict, so there is no need to determine beyond a reasonable doubt that Graham conspired to commit any one of the named object crimes in particular.

---
**DISSENT**
---

AVERN COHN, Senior District Judge, dissenting.

## I. Introduction

I respectfully dissent from Part II.D., Application of U.S.S.G. § 3A1.4 to Sentence, of the majority opinion. I believe it was error to apply the terrorism adjustment under U.S.S.G. § 3A1.4 to defendant's offense conduct as determined under Chapter Two of the sentencing guidelines. Application of the adjustment added over 250 months to defendant's sentence. Effectively, defendant was convicted by the district court and not by the jury of a crime not charged in the indictment and not proved at trial. The fundamental error committed by the district court and condoned by the majority is the failure to give full weight to the definition of a "Federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5) which § 3A1.4 incorporates.

I disagree particularly with three statements in the majority opinion.

–   Noting that there is no applicable case law to assist us, we turn to the language of the Guidelines and analogous provisions for guidance.

As I will describe, the evolution of § 3A1.4, applicable case law as well as the legislative history of 18 U.S.C. § 2332b(g)(5), assists us in deciding on the parameters of a "Federal crime of terrorism." To look to analogous provisions of the guidelines is unnecessary; § 3A1.4 is explicit in its definition of a "Federal crime of terrorism;" there must be a conviction of one of the enumerated offenses in 18 U.S.C. § 2332b(g)(5)(B) before there can be an enhancement under § 3A1.4.

the conspiracy charge (Count 1) is five years' imprisonment. 18 U.S.C. § 371. The statutory maximum for possession of a firearm by an unlawful user of a controlled substance (Count 9) is ten years. 18 U.S.C. § 924(a)(2). Graham also faces mandatory consecutive sentences of five years and twenty years for Counts 13 and 14 ( possession of a firearm in connection with crimes of violence and drug trafficking). 18 U.S.C.A. § 924(c)(1) (West 1998). The combined maximum prison sentences of all counts of conviction if served consecutively would be fifty years. Because Graham's sentence exceeded this limit, the plain error test has been satisfied. We therefore **VACATE** the district court's sentence and **REMAND** for resentencing upon consideration of the *Apprendi* question.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the defendant's conviction, **VACATE** the sentence, and **REMAND** for resentencing in light of *Apprendi*.

---

does not apply in cases involving fifty or more marijuana plants, regardless of weight.

  Graham's quantity objection, however, is distinguishable from the agreement present in *Roper*. In *Roper*, the defendant expressly withdrew his initial objection to the drug quantity set forth in the Presentence Report, in exchange for the government's agreement not to pursue a firearm enhancement. *Roper*, 266 F.3d at 532. The district court asked the defendant if he understood that he was admitting to the quantity finding and the defendant responded that he did. *Id.* In contrast, Graham did not stipulate to responsibility for fifty or more marijuana plants. He merely challenged the sufficiency of the evidence to prove, under a preponderance standard, his responsibility for more than fifty to seventy-five plants. There is no indication in the record that Graham contemplated his objection as an admission to a specific quantity, or that he was informed of any consequences that might attach to the position taken in the objection. He did not acknowledge responsibility for this quantity before the district court at sentencing, nor was he asked to do so.

preponderance of the evidence standard is the correct and appropriate standard for sentencing under the guidelines.").[19]

---

[19]We do not believe that a higher standard of proof is required simply because the enhancement would significantly increase the defendant's sentence. The dissent urges that we adopt the approach taken in *United States v. Kikumura*, 918 F.2d 1084 (3rd Cir. 1990). *Kikumura* held that in extreme situations, where "the magnitude of a contemplated departure is sufficiently great that the sentencing hearing can fairly be characterized as 'a tail which wags the dog of the substantive offense,'" a district court's factual findings regarding the enhancement must satisfy a higher standard of proof than mere preponderance. *Id.* at 1100-01 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986), and holding that twelve-fold, 330-month departure based upon promotion of terrorism could not be applied based upon mere preponderance); *see also United States v. Restrepo*, 946 F.2d 654 (9th Cir. 1991), *cert. denied*, 503 U.S. 961 (1992).

  The *Kikumura* court relied upon the Supreme Court's opinion in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986). *McMillan* held that the government normally is not required to prove beyond a reasonable doubt facts that are prescribed as sentencing factors but are not elements of the substantive offense. The Court noted, however, that "there are constitutional limits to the State's power" to classify facts as sentencing factors rather than elements of the crime. *Id.* at 86. The Court found that those limits were not exceeded by the Pennsylvania statute at issue, because "[t]he statute [gave] no impression of having been tailored to permit the [sentencing factor] finding to be a tail which wags the dog of the substantive offense." *Id.* at 88. In reaching this conclusion, the Court emphasized that the statute "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it . . . ." *Id.* at 87-88.

  In our opinion, *Kikumura* misconstrued *McMillan*. The *McMillan* Court's apparent concern was not whether the sentencing factor's effect on the ultimate sentence was significant, but whether it was appropriately characterized as guiding the court's discretion in punishing the defendant for the crime for which he was convicted. As long as a sentencing factor does not alter the statutory range of penalties faced by the defendant for the crime of which he was convicted, *McMillan* permits the factor to be found by preponderance of the evidence. This interpretation is supported by the Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. The *Apprendi* Court was careful to note that "nothing . . . suggests that it is impermissible for judges to

The district court pointed to six statutes enumerated in § 2332b(g)(5)(B) and held that Graham intended, as a consequence of his § 371 conspiracy, to promote those crimes of terrorism. One of the statutes mentioned by the district court, 18 U.S.C. § 844(i), makes punishable whomever "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." At the sentencing hearing, the district court found that Graham "participated in the illegal conspiracy charged and attempted to achieve the objects of the conspiracy charged." J.A. at 1404. The district court then found that the following targets were known to Graham or were reasonably foreseeable to him in light of the scope of the conspiracy: the intersection of I-94 and U.S. Route 131; power facilities; radio stations; an A-10 ground support aircraft; a federal building in Battle Creek, Michigan; and a television station in Kalamazoo, Michigan. J.A. at 1404. The district court concluded that Graham and his co-conspirators intended to influence and intimidate federal officers in the performance of their duties; that they conspired to possess machineguns and other weapons; and that they discussed plans to attack their targets with the weapons they had acquired, all in furtherance of the conspiracy.

Based on our review of the record, we cannot say that the district court's findings of fact are clearly erroneous. Witness testimony established that Graham or his co-conspirators targeted these places for attack. Moreover, there is no dispute that the targets mentioned by the district court and the acts attributable to Graham were within the scope of the conspiracy and were reasonably foreseeable to the defendant.

---

exercise discretion . . . in imposing a judgment *within the range* prescribed by the statute." *Id.* at 481 (emphasis in original). We therefore decline to adopt the approach taken in *Kikumura* insofar as that case requires a standard higher than preponderance of the evidence for sentencing factors that do not increase the maximum sentence faced by the defendant.

maximum sentence that could lawfully be imposed based upon the jury's verdict as to all counts of conviction. *See Martinez*, 253 F.3d at 255; *Page*, 232 F.3d at 544. As one panel explained:

> There is no doubt that imposing additional years of imprisonment beyond that authorized by a jury's verdict affects a defendant's substantial rights. Furthermore, a sentencing error substantially affects the fairness, integrity, or public reputation of judicial proceedings when a court's error results in imposition of a sentence which is not authorized by law.

*Page*, 232 F.3d at 544 (citation omitted). The Sentencing Guidelines provide that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d). Therefore, plain error could only be found if the sentence imposed by the district court exceeds the sentence that would be imposed if Graham had been sentenced consecutively, rather than concurrently, on all counts of conviction. *See Page*, 232 F.3d at 544-45.

Graham received a sentence of fifty-five years. As noted above, the maximum sentence permitted for each of the two marijuana charges is five years.[23] The statutory maximum for

---

[23]We do not believe that Graham exposed himself to a higher statutory maximum by asserting that "the testimony established he was responsible for between 50-75 plants" in his objections to the Presentence Report. This circuit held in *United States v. Roper* that a defendant's express agreement regarding the quantity of drugs involved is sufficient under *Apprendi* to sustain a sentence in excess of the statutory maximum for an unspecified quantity of drugs. 266 F.3d 526, 532 (6th Cir. 2001). If Graham's objection constituted an express agreement that he was responsible for fifty or more marijuana plants, the statutory maximum for the marijuana charges would be twenty years. *See* 21 U.S.C. § 841(b)(1)(C). The five year maximum prescribed by § 841(b)(1)(D)

sentenced according to the statutory range provided for an unspecified amount of the drugs involved. *See Martinez*, 253 F.3d at 255.

The sentence imposed by the district court was plain error under the *Apprendi* rule as applied in this circuit. Graham received concurrent thirty-year sentences for Count 10 (attempt to manufacture marijuana) and Count 11 (conspiracy to manufacture marijuana). The thirty-year sentences were based upon 21 U.S.C. § 841(b)(1)(B)(vii), which authorizes a sentence of five to forty years' imprisonment for violations of 21 U.S.C. § 841(a)(1) (prohibiting manufacturing marijuana) which involve 100 or more marijuana plants. The statutory maximum for manufacturing an unspecified amount of marijuana is five years. 21 U.S.C. § 841(b)(1)(D); *Martinez*, 253 F.3d at 255 (concluding that § 841(b)(1)(D) represents the maximum sentence available under *Apprendi* where the jury does not find a particular quantity of marijuana). The district court's finding that Counts 10 and 11 involved 100 or more marijuana plants increased the maximum penalty available for these counts from five years to forty years. This quantity was not found by a jury beyond a reasonable doubt. Neither the jury verdict nor the indictment specified the quantity of marijuana charged. *See* J.A. at 94-95 (Superseding Indictment at 19-20); Jury Verdict Form. The sentences imposed by the district court pursuant to Counts 10 and 11, therefore, were plain error under the current law. *See Apprendi*, 530 U.S. at 474 ("The constitutional question . . . is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count").

Our inquiry does not end there, however. Review for plain error also requires a determination that the defendant has been prejudiced, and that the error seriously affects the fairness, integrity, or public reputation of the proceedings. *See United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000), *cert. denied*, -- U.S. --, 121 S. Ct. 2202 (2001). This circuit has held that the second two prongs of plain error review are satisfied when the defendant's total sentence exceeds the

---

Given our review of the trial record, the district court's determination that the defendant's § 371 conspiracy was "intended to promote" a federal crime of terrorism, in particular the crime of maliciously damaging or destroying, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce, was not error. Therefore, we **AFFIRM** the district court's adjustment of Graham's sentence under § 3A1.4.

### E.  Consecutive Sentencing for Counts 13 and 14

Graham's final assignment of error is that the district court improperly sentenced him for his conviction on Count 14, which was based on a violation of 18 U.S.C. § 924(c). Graham received a consecutive five-year sentence on that count for carrying a firearm in relation to a drug trafficking crime as charged in Counts 10 and 11; and a consecutive twenty-year sentence on Count 13 for carrying a semiautomatic weapon in relation to a crime of violence as charged in Count 1.[20] The question for this court, as framed by Graham, is whether his conviction on Count 14 is duplicative of his conviction on Counts 1 and 13 and thereby violates the Fifth Amendment's Double Jeopardy Clause.

Graham claims that the conspiracy to commit crimes against the United States, for which he was convicted of

---

[20]Graham was convicted and sentenced under 18 U.S.C. § 924(c)(1) (1994), which provided:

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a . . . semiautomatic assault weapon, to imprisonment for ten years . . . . In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years . . . .

The statute also stipulated that convictions under the subsection shall not "run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried." *Id.*

Count 1, and the drug trafficking crime, for which he was convicted of Counts 10 and 11, were all part of one underlying offense. To support this proposition, Graham relies on one sentence in the indictment which alleges that "[i]t was part of the [§ 371] conspiracy that its members planned to finance their organization by engaging in narcotics trafficking." J.A. at 79. If the drug trafficking is considered part of the § 371 conspiracy, then, Graham argues, the second § 924(c)(1) conviction, which used the drug trafficking convictions as the predicate offenses, is duplicative of the first § 924(c)(1) conviction, which used the § 371 conviction as the predicate offense. In other words, Graham argues that he committed only one predicate offense for the purposes of a § 924(c) conviction, but that he was sentenced twice under the statute. Graham claims that the district court's refusal to sever the weapons and drug-related counts is proof that the crimes are so interrelated that they constitute one overarching conspiracy.

The Double Jeopardy Clause of the Fifth Amendment prohibits multiple punishments for the same criminal act or transaction. *United States v. Sims*, 975 F.2d 1225, 1233 (6th Cir. 1992), *cert. denied*, 507 U.S. 999 (1993). "In this Circuit, it is well-settled that because of th[e] [Double Jeopardy Clause's] prohibition [on multiple punishments] a court may not impose more than one sentence upon a defendant for violations of section 924(c) which relate to but one predicate offense." *Id.* We have upheld multiple convictions and sentences under 18 U.S.C. § 924(c)(1) so long as such convictions are based on separate predicate acts. *See United States v. Burnette*, 170 F.3d 567, 572 (6th Cir.), *cert. denied*, 528 U.S. 908 (1999) ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful."); *United States v. Nabors*, 901 F.2d 1351, 1357-58 (6th Cir.), *cert. denied*, 498 U.S. 871 (1990). The question for this court is whether Count 14 relies upon a separate predicate act from Count 13.

The power of courts of appeal to correct forfeited claims is circumscribed by the standard of review for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993). This circuit summarized the test for plain error in *United States v. Martinez*, 253 F.3d 251, 255 (6th Cir. 2001):

> (1) there must be an error; (2) the error must be plain; (3) the error must affect the Appellants' substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings.

*Id.* (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)). The district court's error must be plain under current law. "'Current law,' for purposes of plain error review, is the law that exists at the time of review." *United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir.), *cert. denied*, 522 U.S. 925 (1997). Because *Apprendi* was decided before we heard the appeal in this case, it is the "current law" for the purposes of our plain error analysis.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. This circuit has held that where "a finding as to the weight of the drugs determined the range of penalties that would apply" to the defendant, *Apprendi* requires that the weight or quantity of the drugs involved be determined by a jury beyond a reasonable doubt. *United States v. Flowal*, 234 F.3d 932, 936 (6th Cir. 2000). Where there is no mention of drug quantity in the indictment and the jury makes no findings as to the quantity of drugs involved, the defendant can only be

_____

here, however. *Bender* merely holds that the court is not required to consider *Apprendi* challenges when they are not properly argued in written statements filed with the court. The court of appeals nevertheless retains the discretion to notice plain error, even when it is not raised by the parties on appeal. *See United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining that decision to correct plain error is left to discretion of the court of appeals).

3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE, § 856, at 338 (2d ed. 1982). As the Supreme Court has explained, "'[i]n exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Silber v. United States*, 370 U.S. 717, 717-18 (1962) (holding that defect in indictment not raised before either the Supreme Court or the court of appeals could be noticed as plain error) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Both the Supreme Court and this circuit have found *sua sponte* consideration of plain error to be appropriate to remedy unlawful sentences imposed by the district court. *See Bartone v. United States*, 375 U.S. 52, 53 (1963) (holding that district court's error in increasing sentence by one day in the absence of the defendant "was so plain . . . that it should have been dealt with by the Court of Appeals, even though it had not been alleged as error"); *United States v. Winston*, 37 F.3d 235 (6th Cir. 1994) (vacating sentence *sua sponte* where district judge sentenced defendant to life imprisonment based upon aggregate quantity of drugs involved in multiple counts, whereas plain meaning of the statute authorized life sentence only upon finding that the required quantity was involved in a single violation).

In the instant case, the facts relevant to the *Apprendi* issue are fully set forth in the record, and the governing legal principles are clear. *See Finch*, 998 F.2d at 335 (declining to conduct plain error review because failure of defense to raise issue may have influenced development of facts, and issue involved conflicting theories of law). Therefore, we believe this is an appropriate case for *sua sponte* consideration of the *Apprendi* issue.[22]

---

[22] We note that this circuit held in *United States v. Bender* that a defendant was not entitled to consideration of the *Apprendi* issue when he failed to file any written statement on the merits of his *Apprendi* argument. 265 F.3d 464, 474 (6th Cir. 2001). *Bender* is not controlling

In *Nabors*, a panel of this court upheld separate § 924(c)(1) convictions for use of a firearm during a drug trafficking crime, namely possession of crack cocaine with the intent to distribute, and for use of a firearm during a crime of violence, namely the attempted murder of a federal agent. Both predicate offenses occurred as part of one ongoing criminal activity: Nabors shot the federal agent after agents broke down his door while initiating a search of his apartment. Once inside, the agents found drugs and related paraphernalia. We held that because the two convictions under § 924(c)(1) were based on distinct predicate acts and required proof of different facts there was no problem of multiplicity. *See Nabors*, 901 F.2d at 1358.

In this case, as in *Nabors*, the counts at issue rely on different predicate offenses, and one requires proof of facts not required by the other. First, the predicate offenses for the Count 14 conviction are the substantive crimes at 21 U.S.C. §§ 841(a) and 846, which make it illegal knowingly or intentionally to attempt or conspire to manufacture or possess with the intent to manufacture a controlled substance. The predicate act for the Count 13 conviction is the inchoate crime at 18 U.S.C. § 371, which makes it illegal for two or more persons to conspire to commit any offense against the United States and to take an act in furtherance of the conspiracy. Notably, none of the statutes which were named as objects of the § 371 conspiracy involved drug offenses.

Second, Count 14 relied on proof of different facts than Count 13. Graham's conviction on Count 14 was for carrying a weapon while engaged in a crime of drug trafficking; the evidence for this conviction came from William Huggett's testimony that Graham carried a weapon while tending his marijuana patches. In contrast, Graham's conviction on Count 13 was for carrying a weapon while engaged in a conspiracy to commit crimes against the United States; this conviction involved different weapons carried for a different purpose than for Count 14. Indeed, the fact that Graham carried a weapon while cultivating marijuana was completely unnecessary to the proof for his § 371 conviction. Moreover,

as the district court properly pointed out, the marijuana conspiracy began much earlier than the conspiracy to commit a crime of violence.[21]   Thus, this case is similar to *Burnette*, in which we upheld two convictions under § 924(c), one relating to a kidnapping conviction and one relating to a robbery conviction.  While we noted that the kidnapping and the robbery were part of the "same criminal episode," we affirmed the § 924(c) convictions after holding that the predicate offenses were distinct and "the kidnapping occurred significantly before, and independent of, the actual bank robbery."  *Burnette*, 170 F.3d at 572.

Although Graham claims that *United States v. Johnson*, 25 F.3d 1335, 1338 (6th Cir. 1994) (en banc), *rev'd on other grounds*, 529 U.S. 53 (2000), is controlling, we disagree.  In *Johnson*, we held that a defendant may not be sentenced for two § 924(c) convictions for the possession of one or more firearms during a drug trafficking crime when the predicate offenses involve simultaneous possession of different controlled substances.  Graham's predicate offenses were not committed simultaneously, nor did they consist of identical conduct.  Therefore, we conclude that the district court did not err in sentencing Graham to consecutive sentences on two convictions under § 924(c)(1) and **AFFIRM** this aspect of the sentencing.

## F.  Validity of Graham's Sentence Under *Apprendi*

Finally, we consider whether Graham's thirty-year sentences for the marijuana charges, based upon a finding by preponderance of the evidence that Graham's criminal activity involved 100 or more marijuana plants, were constitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  At sentencing, Graham objected to the Presentence Report's conclusion that he was responsible for 100 marijuana plants,

---

[21]We note that this finding by the district court was not inconsistent with its refusal to sever Counts 10, 11, and 14 from the other counts of indictment, as the inquiry whether to sever turns on factors different from the inquiry whether Counts 13 and 14 are duplicative.

contending that the testimony at trial proved he was responsible for between fifty and seventy-five marijuana plants. J.A. at 1456 (PSR at 32).  The district judge overruled this objection, citing videotape evidence introduced at trial showing 100 or more marijuana plants.  Sentencing Hr'g at 45.  After sentencing, but before oral argument on this case, the Supreme Court decided *Apprendi*, which held that facts, other than prior convictions, which increase the maximum sentence faced by the defendant must be presented to a jury and proved beyond a reasonable doubt.  530 U.S. at 490.  Because the finding that Graham was responsible for 100 or more marijuana plants increased the maximum sentence that could be imposed and was not found by a jury beyond a reasonable doubt, we believe it is appropriate to consider the validity of Graham's sentence in light of the rule announced in *Apprendi*.

Graham did not raise the *Apprendi* issue on appeal.  Nevertheless, this Court has discretion to correct plain errors affecting important rights of criminal defendants, even when not raised on appeal.  *See United States v. Finch*, 998 F.2d 349, 354 (6th Cir. 1993) (explaining that appellate court possessed discretion pursuant to FED. R. CRIM. P. 52(b) to consider Fourth Amendment claim, even though the issue was not raised by appellant).  Federal Rule of Criminal Procedure 52(b) provides "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  FED. R. CRIM. P. 52(b).  Rule 52(b) permits *sua sponte* consideration of plain errors that have not been raised before the court of appeals.  As one commentator explained:

> Ordinarily Rule 52(b) is invoked by counsel who, in preparing an appeal, discover what they consider to be an error to which they took no objection below.  The rule is not so limited, however, and the appellate court may take notice of an error on its own motion though it is never put forward by counsel.